J-A08005-16
J-A08006-16

2017 PA Super 29

M.G.,

v.

L.D.,

APPEAL OF: C.B.D., INTERVENOR

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 2845 EDA 2015

Appeal from the Order August 19, 2015
In the Court of Common Pleas of Montgomery County
Civil Division at No(s): 11-31295

M.G.,

v.

L.D.,

APPEAL OF: L.D.,

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 3215 EDA 2015

Appeal from the Order August 19, 2015
In the Court of Common Pleas of Montgomery County
Civil Division at No(s): 11-31295

BEFORE:  BOWES, OLSON AND STRASSBURGER,* JJ.

OPINION BY BOWES, J.:                    **FILED FEBRUARY 08, 2017**

L.D. ("Mother") and C.B.D. ("Grandfather") appeal *pro se* from the trial

court's August 19, 2015 order that denied Grandfather's request for partial

* Retired Senior Judge assigned to the Superior Court.

custody and Mother's request for weekly telephone calls with her now twelve-year-old biological daughter, M.G.D.[1]  After careful review, we reverse and remand.

Mother and Appellee, M.G., are former lovers who adopted one another's biological children, *i.e.*, M.G. adopted M.G.D. and Mother adopted M.G's now-teenage biological son, E.G.D.  The family remained intact for approximately thirteen years, until April of 2011.  On November 14, 2011, M.G. filed a complaint for custody wherein she requested sole legal and physical custody of her son and primary physical custody of M.G.D.  Mother's counterclaim requested primary physical custody of both children and asked that M.G. receive periods of supervised physical custody.

Following a custody conciliation conference, Mother and M.G. entered a series of interim consent agreements which culminated in the August 2, 2012 custody order wherein each parent maintained primary physical custody of her biological child with varying degrees of partial custody of the other child.  Subsequent to the August 2012 order, Mother expressed concerns that E.G.D. was aggressive toward her and M.G.D. and that he had serious mental health issues.  M.G. disputed the allegations against their son.  Nevertheless, the then-appointed parent coordinator recommended

---

[1]  These consecutively listed appeals challenge the same custody order, arise from identical facts, and involve related parties that filed matching Rule 1925(b) Statements, which the trial court addressed jointly.  Likewise, M.G. filed identical briefs in both actions. Thus, we consolidate the appeals for ease of disposition.  The child advocate did not file a brief in either appeal.

that E.G.D. get treatment from Adele Cox, M.D. and Bradford Norford, PhD., and that Mother and E.G.D. participate in parent/child counseling in lieu of the custodial periods outlined in the consent order.[2] Additionally, the parent coordinator recommended that both parents and children participate in a custody evaluation administered by Stephen Miksic, Ph.D.

During a subsequent custody exchange on May 27, 2013, Mother shot M.G., who was in her car, several times in the presence of both children. M.G. escaped grievous injury but spent two to three days in the hospital. E.G.D., who was in the front passenger seat of the car, was not injured. Mother was arrested, tried, and convicted of, *inter alia*, attempted homicide and endangering the welfare of children. She was sentenced to twenty-two and one-half to fifty-two years imprisonment.[3] During the criminal proceedings, Mother was prohibited from communicating with E.G.D. While the criminal court did not level a similar prohibition relating to M.G.D, it proscribed her from talking to her daughter about the shooting incident. Mother continues to maintain that she acted in self-defense and shot at M.G. only to avoid being run down by the automobile M.G. was driving.

---

[2] By adopting Pa.R.C.P. 1915.11-1, effective May 23, 2013, the Supreme Court eliminated the use of parenting coordinators as an improper delegation of judicial duties. As discussed in the body of this opinion, the trial court's subsequent reliance upon a child advocate in lieu of a parenting coordinator raises similar concerns.

[3] We affirmed the judgment of sentence on November 3, 2016.

Following the shooting, M.G. filed protection from abuse petitions against Mother and an emergency petition to modify custody. Grandfather, who is Mother's father, countered with an emergency petition to intervene wherein he requested custody of M.G.D. Grandfather attached a hand written certification outlining his concern that M.G.D. was being physically abused by then-eleven-year-old E.G.D. while in M.G.'s physical custody and that M.G. did not curtail the behavior. Grandfather stated that he observed welts and bruises on his granddaughter following visits with M.G. and that M.G.D. advised him that she feared E.G.D., who had injured her. M.G. filed preliminary objections to Grandfather's petition to intervene. In addition to challenging Grandfather's standing to seek primary custody under § 5324 of the Child Custody Law, 23 Pa.C.S. §§ 5321-5340, M.G. contested Grandfather's claims of physical aggression by her son against M.G.D.[4]

---

[4] The Child Custody Law grants standing to seek physical custody and legal custody as follows:

The following individuals may file an action under this chapter for any form of physical custody or legal custody:

(1) A parent of the child.

(2) A person who stands in loco parentis to the child.

(3) A grandparent of the child who is not in loco parentis to the child:

(i) whose relationship with the child began either with the consent of a parent of the child or under a court order;

Thereafter, Grandfather filed an amended petition to intervene outlining additional incidents of M.G.D.'s abuse at the hands of E.G.D. and noted his grandson's behavioral issues, including alleged incidents where he threatened to kill an elementary school teacher and was suspended from school for posting a racially-charged diatribe on his school's computer network. Grandfather invoked an additional right to seek partial custody under 23 Pa.C.S. § 5325(2), which applies where parents have been separated for at least six months.[5] ***See L.A.L. v. V.D.***, 72 A.3d 690

---

      (ii) who assumes or is willing to assume responsibility for the child; and

      (iii) when one of the following conditions is met:

      (A) the child has been determined to be a dependent child under 42 Pa.C.S. Ch. 63 (relating to juvenile matters);

      (B) the child is substantially at risk due to parental abuse, neglect, drug or alcohol abuse or incapacity; or

      (C) the child has, for a period of at least 12 consecutive months, resided with the grandparent, excluding brief temporary absences of the child from the home, and is removed from the home by the parents, in which case the action must be filed within six months after the removal of the child from the home.

23 Pa.C.S. § 5324

[5] In relation to grandparents that are seeking partial physical custody, the Child Custody Law states, in pertinent part,

      In addition to situations set forth in section 5324 (relating to standing for any form of physical custody or legal custody),

(Pa.Super. 2013) ("Under Child Custody Act, grandparents of a child whose

---

grandparents and great-grandparents may file an action under this chapter for partial physical custody or supervised physical custody in the following situations:

. . . .

(2) where the parents of the child have been separated for a period of at least six months or have commenced and continued a proceeding to dissolve their marriage[.]

23 Pa.C.S. § 5325(2).

On September 9, 2016, our Supreme Court declared that the pertinent portion of § 5325(2), relating to children of separated parents, was unconstitutional. **D.P. v. G.J.P.**, 146 A.3d 204 (Pa. 2016). Herein, M.G. did not challenge the constitutionality of § 5325(2) before the trial court, and, as the Supreme Court explained in **In re Petition of deYoung**, 903 A.2d 1164, 1169 (2006), standing is **not** a jurisdictional prerequisite to subject matter jurisdiction that can be addressed *sua sponte*. Thus, we need not determine whether the High Court's recent decision in **D.P.**, applies to the case at bar. **See Blackwell v. Commonwealth State Ethics Commission** 589 A.2d 1084, 1100 (Pa. 1991) (retroactive application of decision declaring portion of Sunset Act unconstitutional restricted to proceedings pending at time of decision wherein the issue was "properly raised and preserved.").

The learned dissent believes that the foregoing discussion "totally misses the point" and would find instead that the changed law divested Grandfather of standing to continue to pursue partial custody of M.G.D. **See** Dissenting Opinion at 7 n.6. However, our precedent belies this notion. While standing in custody cases may be fluid under some circumstances, it certainly cannot be asserted at any time. Indeed, this Court has held that pursuant to Pa.R.C.P. 1915.5(a), "a standing challenge should be raised within [twenty days of service] so as to give a defendant notice of the other party's intention to object to the action on this ground." **Kellogg v. Kellogg**, 646 A.2d 1246, 1250 (Pa.Super. 1994). Moreover, while we have re-evaluated a party's standing following a **factual** change in circumstances, *i.e.*, the termination of parental rights or adoption, our review of Pennsylvania jurisprudence does not support the *ad hoc* re-evaluation of standing that the dissent endorses herein absent a determination that the change in law applied retroactively.

- 6 -

parents never married have standing to seek partial custody of grandchild."). On June 4, 2013, the trial court entered a temporary order granting Grandfather primary physical custody of M.G.D. and prohibiting anyone except the child advocate, Lisa Kane Brown, Esquire, from discussing Mother's pending criminal case with M.G.D. Attorney Kane Brown was previously appointed through the Montgomery Child Advocacy Project ("MCAP") as the child advocate in relation to the PFA action M.G. filed against Mother.[6]

During the ensuing two-day custody trial, the trial court focused on evidence as to whether E.G.D. presented a significant risk of harm to M.G.D. Pointedly, as it relates to Grandfather's petition, the focus of the court's inquiry was whether M.G.D. "is substantially at risk due to parental abuse, [or] neglect" pursuant to § 5324. If Grandfather could not demonstrate a substantial risk of harm based upon M.G.'s lax response to E.G.D.'s behaviors, he would lack standing to seek physical or legal custody under § 5324. In order to understand each child's perspective of the sibling dynamic, the court heard testimony from, *inter alia*, E.G.D.'s therapist, Dr. Norford, and M.G.D.'s psychologist, Robert Schwarz, Ph.D.[7]

---

[6] According to the non-profit organization's mission statement, "MCAP provides free legal representation to children who are the victims of abuse and neglect in Montgomery County." **See** http://www.mcapkids.org/mission-history/

[7] The trial court's *in camera* interview with M.G.D. was not recorded.

At the close of the evidentiary hearings, the trial court determined that, despite evidence of physicality, Grandfather's concerns for M.G.D.'s safety were unwarranted and that M.G.'s reactions to E.G.D.'s behaviors were not tantamount to parental neglect. Hence, it ruled that Grandfather lacked standing to seek primary physical custody. The trial court sustained M.G.'s preliminary objection, dismissed Grandfather's petition to intervene pursuant to § 5324, and, as a default positon, it awarded M.G. primary custody without addressing any of the best-interest factors that courts are statutorily mandated to consider "in ordering any form of custody[.]" **See** 23 Pa.C.S. § 5328(a).

While the trial court denied Grandfather's petition to intervene pursuant to § 5324 relating to physical and legal custody, it granted Grandfather's petition insofar as he sought to exercise partial physical custody under § 5325. **Id**. at 280. However, the court neglected to fashion a custody schedule for Grandfather. Instead, it decided to "leave it to the attorneys to try and work something out." **Id**. The trial court specifically sought input from the child advocate whom it had previously entreated to take a "proactive" role in the custody case by drafting a list of "dos and don'ts," for the court's approval, regarding conduct in both households and the conditions of custody. **Id**. at 272-273, 275.[8] Neither party appealed.

---

[8] The child advocate's list of conditions is not included in the certified record, and it is unclear whether the trial court formally endorsed any

Between June and July 2013, Grandfather was able to exercise partial custody on two occasions for a total of thirty-six hours before the child advocate unilaterally terminated his custodial rights after she determined that Grandfather contravened her directives regarding appropriate communications with M.G.D. Specifically, the child advocate believed that Grandfather permitted unauthorized telephone contact between Mother and M.G.D. and that he indicated an intention to pump the child for information. Grandfather attempted to explain that the pertinent telephone calls occurred prior to the custody court's prohibition, but his efforts were futile. Similarly, while Grandfather declared that the reference of pumping M.G.D. for information related to information concerning E.G.D.'s physical abuse, the child advocate believed that it related to Mother's pending criminal case. Accordingly, exercising authority delegated by the trial court, the child advocate terminated all contact between Grandfather and M.G.D.

On August 14, 2013, M.G. filed a petition to modify the June 2013 custody order. She requested sole legal and physical custody of both children. Following a hearing, on October 28, 2014, the trial court entered a final order granting M.G. sole physical custody of M.G.D. and her brother.

_____

custody conditions that the child advocate fashioned. It is obvious, however, that the child advocate imposed conditions upon Grandfather because it was her unilateral decision to terminate Grandfather's custodial periods with M.G.D. based entirely upon her belief that the visits were adverse to the child.

Grandfather was denied partial physical custody. M.G. and Mother shared legal custody of the children in name only. M.G. was empowered to make all daily and emergency decisions as well as all educational and therapeutic choices without Mother's consent. If Mother objected to any of the decisions, she was required to petition the court for relief. The custody order limited Mother's contact with M.G.D. to written communication and directed that the child advocate review Mother's correspondence with M.G.D., and, if appropriate, forward it directly to the child.[9] Conversely, "if inappropriate, [the child advocate] may strike the inappropriate portions, and forward [it] to [M.G.D.]" or return it to Mother with an explanation. Trial Court Order, 10/28/14, at 2.

Neither party appealed the October order; however, approximately two weeks later, Grandfather filed a motion to modify the custody order. He again asserted that M.G. and the child advocate had previously precluded him from exercising his custodial rights or contacting his granddaughter on the telephone. He again requested partial custody of M.G.D. consisting of two non-consecutive weekend days per month and one week during summer vacation and sought permission to take the child on his visits with Mother. During the ensuing hearing, the parties agreed to also address Mother's motions for visitation and contact by telephone and written

---

[9] The criminal court prohibited any contact between Mother and E.G.D.

- 10 -

correspondence.[10] N.T., 4/27/15, at 19-20, 44. As to the increased contact, Mother sought permission to make one telephone call and mail one letter to M.G.D. per week.

The focus of the evidentiary hearing was Grandfather's interaction with M.G.D., his ongoing concern about M.G.D.'s welfare around E.G.D., and his remark that he intended to gain information from his granddaughter. Grandfather presented his and Mother's testimony, M.G. testified on her own behalf, and the child advocate presented her concerns that Grandfather's preoccupation with M.G.D.'s safety and his steadfast support of Mother's criminal defense interfered with the children's best interest. Following the evidentiary hearing and review of the parties' post-hearing memoranda, on August 18, 2015, the trial court entered an order denying Grandfather's request for partial physical custody and Mother's requests for weekly telephone contact. It granted Mother permission to mail her daughter one letter per week, subject to the child advocate's approval.[11]

---

[10] The Child Custody Law no longer identifies visitation as a specific form of child custody and equates the term with partial physical custody, shared physical custody, or supervised physical custody. Instantly, it is clear from the context of Mother's incarceration that she uses the term in its literal sense, *i.e.* in-prison visitation or the virtual visitation, which we discuss in the body of this opinion.

[11] Although the parties "agreed to have [the court] hear everything [during the April 27 hearing]," the court's subsequent order only addressed the portions of Mother's requests relating to telephone contact and written correspondence. N.T., 4/27/15, at 44. The court neglected to address prison visitation. If it considered visitation at all, it was in the context of

These timely, *pro se* appeals followed.[12]  Mother and Grandfather filed

identical Rule 1925(b) statements that asserted four issues:

> a) the Court committed an error of law when it denied appellant's requests for visitation and phone contact with her daughter as it deprives appellant ([L.D.]) of her Constitutional rights under the 1st and 14th Amendments.
>
> b) the Court committed an error of law when it denied grandparent visitation to appellant . . .  with his granddaughter, as it applied a "fact" not in evidence when it considered the legal standards in making this decision.
>
> c) the Court committed an error of law when it used the "contentious nature" of the relationships between Plaintiffs and Defendant as the basis of denying Plaintiffs['] requests for contact with the minor child, rather than applying the appropriate legal standards. Also, the Court did not consider the fact that the source of the "contention" is due to the Defendant, not the Plaintiffs, and the Plaintiffs should not be penalized for this.

---

denying Grandfather's request for partial custody, which necessarily subsumed his entreaty to take M.G.D. to a third-party closed-circuit video facility in Philadelphia for virtual visitation during his custodial period.

[12] Under the prisoner mailbox rule, which applies equally to civil matters, Mother is deemed to have filed her notice of appeal on September 12, 2015, the date that she presented it to prison authorities for mailing. **See Commonwealth v. Jones**, 700 A.2d 423, 426 (Pa. 1997) (*pro se* inmate's notice of appeal deemed filed on the date that he gives appeal to prison official or places it in prison's mailbox); **Thomas v. Elash,** 781 A.2d 170, 176 (Pa.Super. 2001) (prisoner mailbox rule applies to all *pro se* filings by incarcerated litigants including civil matter).  Moreover, the Montgomery County Prothonotary erroneously rejected Mother's initial notice of appeal because it misidentified the date of the custody order, which was attached to the notice of appeal.  **See Commonwealth v. Williams**, 106 A.3d 583, 588-589 (Pa. 2014) (clerk of courts lacks authority to reject, as defective, timely notice of appeal; "therefore [it is] obligated to accept and process notices of appeal upon receipt in accordance with the Rules of Appellate Procedure, notwithstanding any perceived defects therein").  Hence, the appeal was timely filed.

d) the Court, in its award of weekly letters from Plaintiff [L. D.] to her daughter, ignored the fact that this does not effect MEANINGFUL communication with her daughter since the Defendant admitted in court that the child is not consistently being given the letters.

Concise Statement of Matters Complained of on Appeal, 9/17/15, at 1.

We review the trial court's custody order for an abuse of discretion. *S.W.D. v. S.A.R.,* 96 A.3d 396, 400 (Pa.Super. 2014). We defer to the trial court's factual findings that are supported by the record and its credibility determinations. *Id*. However, we are not bound by the trial court's deductions or inferences, nor are we constrained to adopt a finding that cannot be sustained with competent evidence. *A.V. v. S.T.*, 87 A.3d 818, 820 (Pa.Super. 2014). In sum, this Court will accept the trial court's conclusion unless it is tantamount to legal error or unreasonable in light of the factual findings. *S.W.D., supra* at 400.

The primary concern in any custody case is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well-being." *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa.Super. 2006) (*citing Arnold v. Arnold*, 847 A.2d 674, 677 (Pa.Super. 2004)).

Mother raises the following questions for review:

1. Did the lower court's decision to deny visitation and phone contact between [L.D.] and her biological daughter [M.G.D.]

violate [L.D.'s] Constitutional Rights under the First and Fourteenth Amendments?

2. Did the lower court ignore a grave issue of child welfare by not immediately modifying custody of [M.G.D.] or allowing her biological family any contact with her to ensure her ongoing safety once new information became available (and was brought to the attention of the court) after the hearing of 4/27/15 which spoke to abuse and /or neglect of the child [M.G.D.] while under the care of appellee [M.G.]?

3. Did the lower court commit an error of law when it utilized "facts" either not in evidence and /or not relevant to applicable law when making its decisions to deny requests of appellants . . . for visitation /phone contact and partial custody /grandparent visitation with the child [M.G.D.]?

4. Are the lower court's decisions in this case in accordance with statutory and case law, and do they provide means for meaningful communication between [Mother] and [M.G.D.]?

Mother's brief at 10.[13]

At the outset, we reject Mother's third argument summarily because the crux of her contention challenges only the trial court's decision vis-à-vis Grandfather and not any aspect of the custody order relating to her custodial rights. Although Mother referenced her custodial rights in phrasing this issue, her argument simply invokes the now-repealed Custody and Grandparent Visitation Act, and asserts that the court erred in failing to grant Grandfather's request for partial custody. As Mother does not present

---

[13] Mother's brief is disjointed. While the first issue raised in her statement of questions presented corresponds with the first argument asserted in her brief, issues two and three are argued in her brief under the headings "Point #3" and "Point 4," respectively. Mother's brief at 19, 20. Consequently, issue four is argued under "Point 2". *Id*. at 17.

a basis to disturb the custody order in relation to her rights, this claim does not warrant relief.

Similarly, we note that Mother's second issue, regarding the court's failure to consider new information about the alleged abuse that E.G.D. inflicted upon M.G.D., is waived because Mother ignored this contention in her Rule 1925(b) statement. **See** Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.").

Moreover, even if the second issue had been preserved, it is meritless. Concisely, Mother asserts that, in rendering its best interest determination, the trial court neglected to consider significant injuries that M.G.D. received to her head and clavicle during July 2014. Mother surmised that the injuries were the result of E.G.D.'s continued physical abuse and that M.G.'s explanation for the injury, *i.e.* that M.G.D. fell from a warped wall at a *parkour* gym,[14] was a dubious attempt to cover up the abuse. Accordingly, she opined that her direct contact with M.G.D. is necessary to verify her daughter's continued safety and welfare. She also complains that she was

---

[14] The notes of testimony includes the malapropism that M.G.D. fell at "a park or a gym[.]" N.T., 4/27/15, at 64. During oral argument, it was confirmed that M.G.D. fell while participating in *parkour*, a training type athletic activity made popular by the television show "American Ninja Warrior." A warped wall is a common obstacle used in *parkour*.

not informed about the incident or the substantial injuries that her daughter suffered. The record belies both of these arguments.

First, the trial court considered testimony regarding the injury, but unlike Mother, it accepted M.G.D.'s explanation that the injury was accidental. Our standard of review precludes us from reweighing the testimony from Mother's perspective and making a contrary determination in her favor. Furthermore, the certified record refutes Mother's insinuation that she was not informed of the injury. In fact, Mother had been advised of M.G.D.'s hospitalization during her criminal sentencing and her present assertion sought only to confirm that this was the same injury that was previously disclosed. Thus, although we believe that the trial court, and more precisely the child advocate, discounted the legitimate concerns of Mother and Grandfather about M.G.D.'s safety around E.G.D., nothing in the record supports Mother's specific assertion concerning the trauma that M.G.D. sustained to her head and upper body during July 2014.

Mother's first preserved argument is that the trial court's custody determination violates her constitutional rights.[15] Although her precise argument is difficult to follow, the crux of this contention is that, even

---

[15] The dissent mischaracterizes our analysis as addressing the trial court's custody factors. In actuality, we address Mother's specific reference to **D.R.C. v. J.A.Z.**, 31 A.3d 677 (Pa. 2011), regarding the viability of the "grave threat" aspect of in-prison visitation, and we confront the trial court's failure to apply the appropriate standard that our High Court outlined in that case. This argument was preserved as a subsidiary component of Issue A in the Rule 1925(b) statement.

though she is incarcerated, her right to visit with M.G.D. is a fundamental right guaranteed by the First and Fourteenth Amendments to the Constitution of the United States of America. She continues that the trial court can only deny her right to visitation to prevent "a severe adverse impact on [M.G.D.'s] welfare." Mother's brief at 15. Other than one citation to our Supreme Court's decision in **D.R.C. v. J.A.Z.**, 31 A.3d 677 (Pa. 2011), Mother supports her cryptic claim with references to the former child custody law, various non-precedential cases, and three cases with questionable relevance to the visitation rights of an incarcerated parent. While Mother's argument is artless, it highlights a significant flaw in the trial court's decision to deny her request for visitation, *i.e.*, by focusing upon Mother's insistence upon her innocence and the effect that Mother's increased contact with M.G.D. would have upon the child's relationship with M.G. and E.G.D., the trial court neglected to consider the factors relevant to determine whether visitation with Mother, or, at least, weekly telephone contact is in M.G.D's best interest. Upon review, we find that the trial court based its denial of Mother's request for expanded contact with M.G.D. on improper considerations.

Section 5328 of the Child Custody Law, which we reproduce *infra*, provides that, "In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the

child[.]" 23 Pa.C.S. § 5328(a). However, where, as here, one parent is incarcerated and will remain imprisoned for an extended period, the applicability of several of the enumerated statutory factors is questionable. Traditionally, when determining the best interest of a child in reference to an incarcerated parent's request for visitation, this Court has considered the factors set forth in **Etter v. Rose**, 684 A.2d 1082 (Pa.Super. 1996). **See D.R.C.**, **supra**.

In **D.R.C.**, our Supreme Court addressed the counseling provision under § 5303(c) of the prior custody statutes and reviewed the trial court's consideration of an incarcerated parent's criminal conviction under § 5303(b). The relevant provisions, which were repealed and reenacted in substantial part at 23 Pa.C.S. §§ 5329(a) and (d), required that, prior to making an order of physical custody or visitation, the court must determine whether a parent who committed one of the offenses enumerated in that section posed a threat of harm to his or her child.[16] Subsection (c) of the

---

[16] In pertinent part, the current version of the statute provides,

**Consideration of criminal conviction**

(**a**) Offenses.—Where a party seeks any form of custody, the court shall consider whether that party or member of that party's household has been convicted of or has pleaded guilty or no contest to any of the offenses in this section or an offense in another jurisdiction substantially equivalent to any of the offenses in this section. The court shall consider such conduct and determine that the party does not pose a threat of harm to

former statute required that the trial court appoint a counselor to the offending parent. The precise question before the High Court in **D.R.C.** concerned who was required to pay for the incarcerated parent's counseling in the state facility. As it relates to the case at bar, in disposing of the issue before it, the High Court found that § 5303(b) and (c) did not apply to incarcerated parents who were only seeking visitation with their children within the prison. The court concluded, "[W]e find that it was not the General Assembly's intent for subsections (b) and (c) to be applied to requests for prison visitation." **Id**. at 687. Instead, the section applied only to custody considerations following a parent's release from prison. **Id**. at 686. The Supreme Court reasoned,

---

the child before making any order of custody to that parent when considering the following offenses:

18 Pa.C.S. Ch. 25 (relating to criminal homicide).

18 Pa.C.S. § 2701 (aggravated assault)

. . . . [a litany of enumerated offenses]

18 Pa.C.S. § 4304(endangering welfare of children)[.]

(**b**) Parent convicted of murder.—No court shall award custody, partial custody or supervised physical custody to a parent who has been convicted of murder under 18 Pa.C.S. § 2502(a) (relating to murder) of the other parent of the child who is the subject of the order unless the child is of suitable age and consents to the order.

. . . .

23 Pa.C.S. § 5329 (effective November 30, 2015).

> [D]ue to the strictures of their confinement and the rules of the penal institution, incarcerated parents are unable to engage in the type of physical interaction feared by the drafters of this legislation. Thus, it would serve no significant ameliorative purpose to mandate counseling for every incarcerated offending parent for the limited and closely scrutinized contacts associated with prison visits. A visitation request by an incarcerated parent necessarily stands on different footing than a traditional custody petition.

*Id*.

While the Supreme Court concluded that a mechanical application of § 5303 was ill-fitting in the visitation scenario, it astutely observed that the nature of the incarcerated parent's criminal conduct was a component of the determination. Thus, referring to **Etter**, **supra**, a prison visitation case decided by this Court, our High Court outlined the various factors relevant to prison visitation. The Court explained,

> In prison visit cases, the court in fashioning an appropriate order, where it determines visits would be in the child's best interests, is limited to a determination of the number of visits and perhaps some contacts through telephone calls and written correspondence. . . . [P]rison visit requests involve additional factors unique to that scenario that courts must consider in evaluating the overarching best interests of the child. For example, in **Etter v. Rose**, 454 Pa.Super. 138, 684 A.2d 1092, 1093 (1996), the Superior Court recognized some of the factors to be considered in deciding a question of visitation where the parent is incarcerated: (1) age of the child; (2) distance and hardship to the child in traveling to the visitation site; (3) the type of supervision at the visit; (4) identification of the person(s) transporting the child and by what means; (5) the effect on the child both physically and emotionally; (6) whether the parent has and does exhibit a genuine interest in the child; and (7) whether reasonable contacts were maintained in the past. Of course, although not mentioned in **Etter**, another relevant consideration is the nature of the criminal conduct that

culminated in the parent's incarceration, regardless of whether that incarceration is the result of a crime enumerated in section 5303(b).

*Id*. The ***D.R.C.*** Court reversed the order denying relief and remanded the matter for a hearing to address the parent's request for prison visitation pursuant to the relevant factors. We recognize that ***D.R.C.*** concerns the statutory interpretation of a provision that has been repealed and reenacted as § 5329 of the current child custody law. However, since § 5329 is materially indistinguishable from its predecessor, we follow the guidance that our High Court provided in addressing prison visitations in ***D.R.C.***

Herein, the trial court did not consider how visitation would affect M.G.D. physically and emotionally in light of her age, travel logistics, and supervision during the visit. Likewise, it neglected to determine whether Mother's interest in expanding her contact with M.G.D. is genuine. Moreover, the trial court failed to consider the nature of Mother's criminal conduct or its effect upon her daughter.

Rather than confronting the relevant factors, the trial court first noted that incarceration necessarily curtailed Mother's freedom of association and it then considered Mother's past statements and behaviors, which it characterized as arrogant and short-tempered. In addition, the court implicated Mother in Grandfather's statement to her that he would pump M.G.D. for information, which the court interpreted as an attempt to influence the child's testimony in the criminal proceedings. In sum, the trial

court reasoned that "permitting visitation and/or telephone contact with the child(ren) would be detrimental to the child(ren) given that [Mother] and Grandfather continue to maintain that [Mother] is innocent in the shooting of M.G." Trial Court Opinion, 10/19/15, at 6 (parentheses in original) (citation to record omitted). As the trial court failed to consider the visitation factors that we outlined in **Etter**, **supra**, and that our Supreme Court endorsed in **D.R.C.**, **supra**, we vacate the order denying Mother's request for visitation and remand for the trial court to render a determination in light of the appropriate considerations.

Although we remand for further proceedings, our resolution of Mother's remaining complaint, which is a tangent of her request for visitation, will assist the trial court's visitation determination. We therefore address that argument as well.[17] Essentially, Mother contends that the court's denial of her request for greater contact with M.G.D. denied her the right to meaningful communication with her daughter. In asserting this complaint, Mother highlights the extent of the child advocate's interference, albeit on authority delegated by the trial court, with her already-

---

[17] We respectfully disagree with the dissent's perspective that Mother did not complain of Attorney Kane Brown's role throughout the custody proceedings. The issue is an integral component of Issue D in the Rule 1925(b) statement insofar as she challenged Attorney Kane Brown's interference with her meaningful communication with M.G.D. Likewise, Mother preserved the claim in Issue 4 of her statement of questions presented and highlighted Attorney Kane Brown's overreaching at pages seventeen through eighteen of her brief.

compromised ability to communicate with her daughter. The following facts are relevant to our review.

As noted *supra*, in fashioning the June 2013 custody order, the trial court enlisted the child advocate to oversee the custody arrangement. During October 2014, the trial court extended its reliance upon the child advocate and directed her to review Mother's correspondence with M.G.D. and censor, redact, or strike any portions that she deemed inappropriate. The certified record demonstrates that the child advocate wielded her delegated authority industriously. She regularly micromanaged Mother's contacts with M.G.D. in the name of the child's best interest. Beyond merely reviewing Mother's missives for inappropriate content, the child advocate first objected to Mother numbering her correspondence, and then instructed Mother to reduce the frequency of her weekly correspondence with M.G.D. to one letter per month. Neither of these edicts involved any specified inappropriate statements on Mother's part. The child advocate disapproved of the enumeration because she had not seen the prior letters and could not confirm that they had been sent. N.T., 4/27/14, at 83. Likewise, she limited the communications to "small talk" and ordered that Mother reduce the frequency of the communiqués because she was told that their frequency upset the child. *Id*. at 80, 83.

As to the latter requirement, even when Mother complied with the child advocate's mandate and waited longer than normal before mailing

M.G.D. her next letter, the child advocate was still dissatisfied. The child advocate rejected that correspondence because Mother had written to M.G.D. to expect fewer letters from her and attempted to reassure her that the reduction did not mean that Mother loved her any less. The child advocate characterized this letter as "about three paragraphs" that she believed were patently inappropriate to forward to her adolescent client. In reality, she objected to the following passage,

> [M]y dearest [M.G.D.], hello sweetheart. I'm sending you a big hug through the page of this letter. I hope you can feel it sending you my warmth and love. You may have noticed that it was a little longer than usual between my last letter and this one. The reason for that is because [the child advocate] told me that sometimes it upsets you when you read my letters, so she [M.G.] and Dr. Norford [18]would like me to send you less letters. Now, [M.G.D.], the last thing I want is for you to be upset. I realize you are in a tough situation, and I certainly don't want to make it worse. Now I understand that reading my letters means you think of me and us and that makes you miss me more, and that is very hard. So I will send you less letters for now as long as you understand that it does not mean I am thinking about you less because my love now is stronger than anything on this [E]arth and that I feel it each minute of every single day just as I know how much you love me . . . too.

*Id*. at 83-84.

In justifying her decision to the trial court, the child advocate explained, "[R]ather then redact almost the entire first page of [Mother's] Letter, which would have looked rather strange, I sent it back to [Mother] with a letter . . . stating [that 'the entire first paragraph is inappropriate']

---

[18] Curiously, Dr. Norford is E.G.D.'s therapist. As noted *supra*, M.G.D. was treated by Dr. Schwarz.

and [informing her] that if she wanted to rewrite it and leave those portions out . . . [she] would be happy to forward it to [M.G.D.]" *Id*. at 80-81 (quoting Child Advocate's Letter dated 2/10/15).

Neither of the child advocate's explanations identifies which aspect of the letter was inappropriate, and the record does not reveal the specific reason for the child advocate's unilateral decision to reject it. As outlined, *supra*, Mother's letter did not insult or belittle M.G. or E.G.D., discuss Mother's pending criminal matters, or even present a false hope of their immediate reunification. Indeed, we are uncertain whether the child advocate protested the letter's reference to M.G. and Dr. Norford, Mother's loving reassurances, or the statement that implicated the child advocate in the decision to reduce the contacts. While we will not presume to know the child advocate's logic, it is evident that the result of the child advocate's excessive control was that Mother was required to reduce her weekly contacts with M.G.D. and then was forbidden to explain to her daughter why she was sending the correspondence less frequently.

Although Mother declined to revise the pertinent letter and simply acquiesced to the child advocate's directive to communicate with her daughter less frequently, this episode, which stems entirely from the child advocate's overreach of her court-ordered mandate to ensure that the correspondence was appropriate, uncovered yet another problem with this

case—the trial court's improper delegation of its authority to child advocate Attorney Kane Brown.

The trial court did not define Attorney Kane Brown's precise role in this child custody case. Indeed, the court's Rule 1925(a) opinion refers to Attorney Kane Brown interchangeably as both a child advocate and guardian *ad litem*. **See** Trial Court Opinion, 10/19/15, at 2, 7, 8. Unlike the roles of guardian *ad litem* and counsel for child, which are clearly delineated in the child custody law, the statute does not recognize the role of "child advocate" or define the scope of a child advocate's authority in custody cases. **See** 23 Pa.C.S. §§ 5334-5335. Recall that Attorney Kane Brown was initially appointed through MCAP as M.G.D.'s child advocate in the PFA action against Mother, and ostensibly retained pursuant to 42 Pa.C.S. § 5983, which provides for the appointment of advocates for children who are victims or material witnesses in criminal proceeding.[19]

---

[19] That statute provides as follows:

> **(A) Designation of persons to act on behalf of children**.— Courts of common pleas may designate one or more persons as a child advocate to provide the following services on behalf of children who are involved in criminal proceedings as victims or material witnesses:
>
> (1) To explain, in language understood by the child, all legal proceedings in which the child will be involved.
>
> (2) As a friend of the court, to advise the judge, whenever appropriate, of the child's ability to understand and cooperate with any court proceedings.

Moreover, stark differences exist among the appropriate responsibilities of an MCAP attorney appointed as a child advocate for a victim of abuse, neglect, or a crime; a guardian *ad litem* appointed under § 5334; and legal counsel appointed pursuant to § 5335. Basically, the MCAP child advocate utilizes a holistic approach to representation that is not specifically authorized by the child custody law and transcends both that of guardian *ad litem* and legal counsel.[20]

---

(3) To assist or secure assistance for the child and the child's family in coping with the emotional impact of the crime and subsequent criminal proceedings in which the child is involved.

**(b) Qualifications.**--Persons designated under subsection (a) may be attorneys at law or other persons who, by virtue of service as rape crisis or domestic violence counselors or by virtue of membership in a community service organization or of other experience acceptable to the court, possess education, experience or training in child or sexual abuse and a basic understanding of the criminal justice system.

42 Pa.C.S. § 5983.

[20] MCAP child advocates are charged with the mission "to give Voice, Healing and Security to children." ***http://www.mcapkids.org/mission-history/***. Indeed, as stated with a spirit commensurate with the organization's impactful role, MCAP defines its child advocacy by stating, "We help kids be kids and recapture their childhoods! We give children roots to grow and wings to fly. We advocate for our kids, so that they will be the SUPERHeroes they were born to be!" ***Id***. In sum, the MCAP child advocate cultivates a protective emotional and social environment as well as providing legal expertise.

Furthermore, the two types of representatives that are authorized under the child custody law serve different functions, and the trial court's intention in appointing Attorney Kane Brown is not obvious from the authority that it delegated to her throughout these proceedings. For example, Attorney Kane Brown has performed tasks consistent with legal counsel appointed under § 5335(a), *i.e.*, she invoked the privilege of communication during one hearing, and the trial court routinely invited her to present evidence and cross-examine witnesses. However, during the identical period, Attorney Kane Brown maintained monthly telephone contact with M.G.D., presented her concerns and general recommendations to the court consistent with the guardian *ad litem's* powers and duties under § 5334(b)(6) and (8), and the trial court not only examined her on the record, presumably under oath, and elicited opinion testimony interpreting one of Grandfather's statements, but it also subjected her to cross-examination by Mother and Grandfather. The latter considerations are particularly relevant in light of the fact that, effective September 3, 2013, the Supreme Court clarified, *inter alia*, that the guardian *ad litem* can no longer represent **both** the best interest and legal interest of the child, or present evidence or cross-examine witnesses; however, the guardian *ad litem* may testify and be subject to cross-examination.[21] While the changes became effective three

---

[21] The Editors' Note following 23 Pa.C.S. § 5334 explained,

months after the trial court first endowed Attorney Kane Brown with her court-ordered authority during June 2013, the alterations were operative when the trial court extended this power in its October 2014 custody order. Moreover, Attorney Kane Brown's role as child advocate was ambiguous at the outset. At best, the trial court's mandates blurred the lines of Attorney Kane Brown's appointment, and at worst, the action was the improper delegation of judicial-decision making authority reminiscent of a parenting coordinator. Thus, upon remand, the trial court shall state Attorney Kane Brown's specific role with clarity and ensure that she acts within the statutory authority of that appointment.

Having reversed the portion of the custody order relating to Mother's request for visitation and increased non-physical contact, we next address Grandfather's *pro se* appeal. He presents four questions for our review:

> [1.] Was the relevant evidence before the lower court sufficient to terminate the Partial Custody previously granted to the grandfather by Order of June 12, 2013? The Order being appealed was entered on August 19, 2015 and terminated Partial Custody in the Grandparent.

---

**SUSPENDED IN PART**

23 Pa.C.S.A. § 5334 is suspended insofar as it (1) requires that a guardian ad litem be an attorney, (2) permits the guardian ad litem to represent both the best interests and legal interests of the child, (3) provides the guardian ad litem the right to examine, cross-examine, present witnesses and present evidence on behalf of the child, and (4) prohibits the guardian ad litem from testifying, pursuant to Pa.R.C.P. No. 1915.25.

23 Pa.C.S. § 5334; Pa.R.C.P. 1915.25 (effective September 3, 2013).

[2.] Is the lower court permitted to consider the opinion of the attorney for M.G.D. as determinative to a finding of that which is in the "best interests" of the child when that attorney, guardian ad litem clearly has no expertise in the relevant professions to render such opinions and there is no testimony in the record as to any negative impact that Grandparents Partial Custody would have on M.G.D.(Grandchild)?

[3.] Is the lower court permitted to determine a potential future harmful impact upon M.G.D.(Grandchild) upon a completely unsubstantiated interpretation of a Statement made by Intervenor-Appellant?

[4.] Did the lower court err by not considering (a) the importance of preserving the stability in the life of M.G.D. when it completely removed the Grandfather from the life of M.G.D., and (b) the traumatic effect upon M.G.D. that would surely result from the continued denial of contact between M.G.D. and her grandfather?

Grandfather's brief at 2-3.

Grandfather's brief does not conform to Pa.R.A.P. 2119 insofar as he failed to divide the argument into sections that correspond with the four issues he raised in his statement of questions involved. Instead of complying with the procedural uniformity of Rule 2119, Grandfather presents one rambling argument that touches, to varying degrees, upon on the points that he noted in his statement of issues. While this Court is authorized to quash a nonconforming brief, his procedural misstep does not substantially impede our ability to perform appellate review, and we shall address the merits of the arguments that have been preserved for review in the Rule 1925(b) statement. *See* Pa.R.A.P. 2101; ***Commonwealth v. Adams***, 882

A.2d 496, 498 (Pa.Super. 2005) ("Despite the numerous defects in Appellant's brief, we will address the one claim that we are able to review[.]").

Next, we observe that Grandfather's first and fourth claims are waived due to his failure to present them in his Rule 1925(b) statement. **See** Pa.R.A.P. 1925(b)(4)(vii). Likewise, while Father hinted at the crux of his second claim in his Rule 1925(b) statement, *i.e.*, the trial court erred in denying him partial custody by "appl[ying] a 'fact' not in evidence," he failed to identify the fact that he intended to challenge, and the trial court was unable to address this claim. **See** Concise Statement of Matters Complained of on Appeal, 9/17/15, at 1. Grandfather attempts to rectify his mistake by specifying in his brief that the trial court erred in equating Attorney Kane Brown's supposition with actual fact. However, this *post hoc* explanation is unavailing. By failing to articulate a specific argument in his Rule 1925(b) statement that the trial court could identify, Grandfather forfeited appellate review of this issue. **Reinert v. Reinert**, 926 A.2d 539 (Pa.Super. 2007) (issue raised on appeal waived where Rule 1925(b) statement was too vague for trial court review).

While M.G. also asserts that the third issue is waived pursuant to Rule 1925(b), we disagree with that assessment. The Rule 1925(b) statement delineated that, *inter alia*, the trial court erred in relying on the effect of the perceived discord between Grandfather and M.G. as the basis for denying

him periods of custody with his granddaughter. Contrary to M.G.'s characterization, our interpretation of Grandfather's Rule 1925(b) statement subsumes the third argument that Grandfather raises herein.[22] Accordingly, we will address it.

Grandfather challenges the trial court's finding that he and Mother are responsible for the family's contentious relationship with M.G. In reaching this conclusion, the trial court pointed to three factual determinations: (1) Grandfather demeans M.G. by insisting upon referring to her as "adoptive mother;" (2) he believes Mother acted in self-defense despite the jury conviction; and (3) he attempted to alienate M.G.D. from M.G. and E.G.D. As we discuss *infra*, the certified record clearly sustains the trial court's findings that Grandfather referred to M.G. as adoptive mother and advocated Mother's criminal defense. However, since there is no indication in the record that Grandfather shared with M.G.D. his personal perspective of M.G. or discussed Mother's legal defense in the child's presence, we reject the inference that those differences interfered with the parent-child relationship.

The following legal principles guide our review. This court must defer to the trial court's credibility determinations and its factual findings that are

---

[22] While the dissent does not hesitate to find the third issue waived, Rule 1925(b)(4)(v) provides for a nuanced review of claims that treats as preserved the specific error identified as well as "every subsidiary issue contained therein[.]" Instantly, we find that the specific claims that Grandfather leveled in Issue C of his Rule 1925(b) statement subsume the third argument that he makes on appeal.

supported by the record. ***S.W.D., supra*** at 400. However, findings of fact that cannot be sustained with competent evidence are not binding. ***A.V., supra*** at 820. "Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record." ***See K.T. v. L.S.***, 118 A.3d 1136, 1159 (Pa.Super. 2015) (quotations omitted).[23]

The child custody law outlines the relevant factors to consider in determining whether to award partial physical custody to a grandparent who has standing to pursue partial custody under § 5325(2) based upon the dissolution of her parents' relationship. In this scenario, § 5328(c)(1) requires that the trial court consider:

> (i) the amount of personal contact between the child and the party prior to the filing of the action;
>
> (ii) whether the award interferes with any parent-child relationship; and
>
> (iii) whether the award is in the best interest of the child.

23 Pa.C.S. § 5328(c)(1). Moreover, in adjudicating the child's best interest under § 5328(c)(1)(iii), the trial court is required to engage in a review of

---

[23] While the dissent criticizes what it depicts as our glib disagreement with the trial court's findings of fact, our standard of review demands that this Court ensure that the trial court's factual determinations are sustained by competent evidence of record. As noted in the body of this writing, some of the trial court's findings are founded on Attorney Kane Brown's supposition and others are based on insinuations leveled during Mother's criminal case. Thus, our observations regarding these tenuous factual underpinnings, as well as the inherent contradiction in the trial court's risk-of-harm discussion undoubtedly is within the purview of our standard of review. ***See A.V.***, ***supra*** at 820.

the sixteen statutory best-interest factors applicable when making any order

of custody. **K.T.**, **supra** at 1159; **L.A.L.**, **supra** at 695; 23 Pa.C.S. §

5328(a).[24]

---

[24]  The list of best-interest factors include:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

Instantly, the trial court denied Grandfather's request for partial custody because it determined that partial custody would interfere with M.G.D.'s relationship with M.G., and would be adverse to M.G.D.'s best interest. Specifically, the court concluded that Grandfather's animosity towards M.G., insistence upon Mother's innocence in the criminal matter, and alleged attempt to influence M.G.D.'s testimony in that case were detrimental to M.G.D. The court also determined that Grandfather's feigned concern for M.G.D.'s safety in M.G.'s household was designed to alienate M.G.D. from M.G. and E.G.D.

---

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a)(1)-(16).

In explaining its rationale, the trial court ignored our recent decision in *K.T., supra*, wherein we addressed grandparent custody under § 5328(c)(1). Instead, the court relied upon two cases that predated the current child custody law, *Zaffarano v. Genaro*, 455 A.2d 1180 (Pa. 1983) and *Miller v. Miller*, 478 A.2d 451 (Pa.Super. 1984), which discuss the effects of hostility between parents and grandparents. More importantly, however, the trial court omitted the component of the § 5328(c)(1) analysis relating to M.G.D.'s level of personal contact with Grandfather prior to the custody litigation, and it utterly failed to engage in the required review of the statutory best-interest factors pursuant to § 5328(a). Since Grandfather did not assert these omissions as grounds to reverse the instant custody order, we do not raise them *sua sponte* in order to grant relief. We note, however, that had Grandfather leveled these complaints, we would have reversed the custody order on the basis of the omitted best-interest factors alone. *See L.A.L. supra* ("Because the present record does not evince a thorough analysis of all relevant factors, we cannot conclude that the trial court properly considered the Child's best interest."). Nevertheless, as we are compelled to reverse the order relating to Grandfather due to the trial court's unsupported factual findings, we caution the court to be mindful of the statutory requirements on remand and to perform the appropriate best-interest analysis as required by the child custody statute. *See K.T.*, *supra* at 1159.

First, as it relates to Grandfather's persistent references to M.G. as "adoptive mother," we agree that the moniker is inexcusable and Grandfather's cavalier reaction to M.G.'s objection to the epithet evinces his disdain for her as a parent and ignores M.G.'s unwavering legal, emotional, and moral responsibility to her daughter. Notwithstanding Grandfather's insensitive behavior, however, considering the procedural and factual errors that we have encountered in reviewing the trial court's custody decision, we find that the derogatory statements do not warrant depriving Grandfather of his custodial rights—particularly in light of his pledge to drop the disparaging qualification and to simply refer to M.G. as the child's mother.

Next, concerning the discussion of Mother's legal defense with M.G.D., the trial court adopted Attorney Kane Brown's interpretation of Grandfather's statement that he would "pump M.G.D. for information" as an indication of Grandfather's intention to influence the child's testimony in the criminal proceedings. As Grandfather points out in his brief, nothing in the certified record suggests that he has **ever** discussed the criminal matter with M.G.D., let alone attempted to influence her testimony. He further explained that he made the statement in reference to his granddaughter's allegations of abuse in M.G.'s household. Indeed, apparently recognizing this reality, M.G. concedes in her brief that the "pump for information" statement related to Grandfather's intention to obtain details of the abuse that he suspected that his granddaughter was enduring at the hands of E.G.D. ***See*** Appellee's brief

at 8 (stating that Grandfather's actual purpose for seeking this information was to undermine the parent-child relationship). While M.G. could have leveled an alternative assertion in her brief concerning Grandfather's alleged attempt to obtain information from M.D.G. about the shooting, she did not. In fact, Appellee does not mention Grandfather's comment in reference to the criminal matter at all. Unlike Attorney Kane Brown's conjecture about Grandfather's intent to interfere with the criminal matter, as we highlight *infra*, the certified record is replete with evidence that M.G.D. has been required to endure E.G.D.'s physical mistreatment without M.G.'s intervention. As the certified record will not sustain Attorney Kane Brown's supposition concerning what she believed Grandfather intended by the statement, the court erred in adopting her perspective as grounds to deny partial custody.

Likewise, neither M.G. nor the trial court identified any countervailing evidence to contest Grandfather's statement that he never discussed the incident with M.G.D. Grandfather testified that soon after the May 27, 2013 shooting, he scheduled a meeting between M.G.D. and Mother's defense counsel. *Id*. at 25, 27. The scheduling occurred prior to the custody court's June 4, 2013 order precluding any discussion of the incident, and once the trial court issued its order, the meeting was immediately cancelled. *Id*. Accordingly, this finding also is unsupported.

Finally, we address the trial court's finding of alienation, which is the primary ground for concluding that awarding Grandfather partial physical custody of M.G.D. would interfere with her relationship with M.G. Throughout the proceedings, the trial court was preoccupied with how its ruling would affect M.G.D.'s relationships in M.G.'s home. For example, it interpreted Grandfather's ongoing concern for M.G.D.'s safety around E.G.D. as a pretext to alienate his granddaughter from that side of her family. Indeed, when the trial court actually confronted the issue in its threshold determination of Grandfather's standing, it was less concerned with M.G.D.'s safety than the effect that the allegations of abuse would have upon E.G.D. The court's reaction and its finding of alienation would be reasonable if the allegations of physicality had been completely refuted. However, that is not the case herein.[25]

The record demonstrates that, notwithstanding M.G.'s protestations to the contrary, E.G.D. posed a risk to M.G.D.'s safety and that Grandfather's concerns were warranted. During the June 2013 hearing, Dr. Norford testified about the treatment that he rendered to E.G.D. in order to address

---

[25] To be clear, we do not revisit the 2013 proceeding in order to disturb the trial court's prior conclusions that E.G.D. did not abuse his sister or that M.G.'s response to E.G.D.'s behavior was not tantamount to parental neglect that conferred standing to Grandfather to seek primary physical custody of M.G.D. Neither of these issues is presently before this Court. Instead, we review the evidence adduced during the 2013 hearing in light of the trial court's current finding that Grandfather's continued concern for M.G.D.'s safety is pretextual and to highlight that the trial court shared similar safety concerns during 2013, even though it declined to find abuse or neglect.

his aggressive behavior. Dr. Norford treated E.G.D. for approximately one month during June 2011 and resumed treatment during January 2013, following E.G.D.'s publication of inappropriate statements on the school's computer network. He described the post as racially and ethnically insensitive, extremely intense, and aggressive, but lacking any direct threats of violence to any of the individuals that he identified. In spite of that conclusion, he recommended that the school increase its monitoring of E.G.D., require weekly meetings with the school guidance counselor, regular contact with his psychiatrist, and outpatient therapy. Since the resumption of counseling, E.G.D. participated in nine sessions, two of which followed the shooting incident.

Dr. Norford testified that E.G.D. had a fairly substantial case of attention deficit hyperactivity disorder ("ADHD") with a small degree of symptoms consistent with anxiety and Asperger's Syndrome. He highlighted that E.G.D. exhibited impulsiveness and poor judgment. E.G.D. takes four types of daily medication to address his impulsivity and to sharpen his focus. Dr. Norford also noted that, while Mother highlighted the boy's symptoms, M.G. elected to minimize them. For example, although Mother presented several examples of their son's aggressive and excessive behavior throughout his childhood, M.G. consistently downplayed those episodes.

For his part, Dr. Norford found that the behaviors were typical for a child with ADHD and did not characterize E.G.D. as particularly aggressive or

harmful to people in general. Paradoxically, however, in describing the profanity-laced blog post for which he was suspended from school for two days, he opined, "I don't want to say that someone is not any danger to somebody when you have a rant like that sitting there." N.T., 6/10/13, at 42-43. He also noted that while it had been reported that the child previously threatened an elementary school teacher and stole a knife from a home his parents were considering purchasing, he did not follow up either report.

As it relates specifically to M.G.D., Dr. Norford explained that E.G.D. speaks positively of his sister and smiles when he talks about her. He never expressed anger with his sister or blamed her for her accusations of abuse. Instead, E.G.D directs his anger toward Mother. Dr. Norford reported, "He says that [Mother] believes he is violent and that, if anything happens to [M.G.D.] when they're playing, that it might result in her not being able to come back." *Id*. at 47. The witness continued, "he feels that . . .[M.G.D. will] say what [Mother] feels about the situation[.]" *Id*. Based on these conversations, Dr. Norford did not believe that E.G.D. is intentionally aggressive or violent with his sister and attributed the girl's injuries to roughhousing between siblings. During Attorney Kane Brown's cross-examination, Dr. Norford agreed with her supposition that E.G.D. may not realize that his sister perceives his ADHD symptoms as aggressive behaviors. *Id*. at 71-72.

Dr. Norford conceded that his conclusion was based entirely upon E.G.D.'s and M.G.'s versions of the sibling relationship and data from E.G.D.'s school. Significantly, he has never to spoken to M.G.D. and he only observed the children together once in the waiting room outside his office. Moreover, neither E.G.D. nor M.G. informed Dr. Norford that M.G.D. hid in the closet to avoid interacting with her brother.

In contrast to the benign interactions that Dr. Norford relayed to the court, Dr. Schwarz, who has treated M.G.D. monthly since August of 2012, testified that M.G.D. was unhappy in M.G.'s home. During the majority of their sessions, M.G.D. complained to him that E.G.D. was physically abusive and confirmed that M.G. did not curb E.G.D.'s behavior. In addition to general complaints of rough treatment, she described two specific examples of physicality. On one occasion, E.G.D. placed his legs around her neck and squeezed them in a chokehold-like maneuver. During a separate incident, E.G.D. put M.G.D. in a headlock. Dr. Schwarz testified that, when M.G. told him that M.G.D. was always happy and smiling in her presence, he advised M.G. that her daughter "has been pretty consistently unhappy with [the situation with E.G.D. and the lack of limits.]" N.T., 6/12/13, at 292.[26] While

---

[26] The notes of testimony for the June 12 hearing is paginated both independently and consecutive to the June 10 hearing. Additionally, the morning and afternoon sessions of the June 12 hearing were transcribed in reverse order. For ease of reference and to limit confusion, we cite to the uniform pagination.

Dr. Schwarz was concerned about M.G.D.'s protests, he did not believe that the actions warranted advising a child service agency of potential child abuse.

Dr. Schwarz also testified that, from his initial interaction with M.G.D., the child outlined issues with E.G.D., M.G's lack of structure, and her feeling that she would not be "protected from her older brother." *Id*. at 296. M.G.D. also relayed that she took shelter in a closet while at M.G.'s home "because she was unhappy[,] wanted to read[,] and . . . needed to be left alone." *Id*. Significantly, Dr. Schwarz rejected the trial court's attempt to minimize E.G.D.'s behavior as common sibling roughhousing. He stated, "I took it more as . . . a little worse than roughhousing . . . the[se] are brothers and sisters who don't treat each other all that well." *Id*. at 307.

Nevertheless, the trial court rebuffed Dr. Schwarz's perspective of the physical interactions, continued to diminish M.G.D.'s reports as normal sibling roughhousing, and expressed its shock that more incidents had not been reported over the seven-year period in light of E.G.D.'s condition. The court reasoned, "Siblings fight. Kids fight. Kids get injured as a result. . . . Kids fight. And every now and then kids fight to a point where one gets injured, sometimes more seriously than others." *Id*. at 269. Even when the court acknowledged that E.G.D.'s actions could have been intentional, the court was "not convinced by a preponderance of the evidence that there is such serious abuse by [E.G.D.] that would prompt [it] to say that [M.G.]

- 43 -

is . . . neglectful to such a point that [Grandfather] should be permitted to intervene in this case." *Id*.

Tellingly, however, despite relegating the referenced incidents to typical rambunctiousness between children, the trial court cautioned M.G. about her lax discipline of E.G.D. and warned, "[Y]ou've got to recognize that [M.G.D.] is a little girl who may need a watchful eye **all** the time she's with her brother and needs to be reassured that you are taking care of the issues." N.T., 6/10/13, at 270 (emphasis added). Later, the trial court repeated its caveat: "[I]t's up to you, [M.G.] to monitor that in your home. That means that you don't leave these two children alone. Don't leave them alone." *Id* at 274. If M.G.D.'s injuries were truly the unfortunate but acceptable product of sibling roughhousing, the trial court's admonishment of M.G. would be unnecessary.

Thus, while the court deemed E.G.D.'s behavior to be something less than physical abuse, the trial court's demonstrated concern about M.G.'s hesitancy to address her son's conduct validated Grandfather's apprehension about M.G.D.'s safety in that household. Stated another way, the court's factual findings regarding the siblings' abrasive interaction substantiates Grandfather's concern over the potential threat that E.G.D. would pose to M.G.D. if his behavior was permitted to continue unchecked. The trial court's corroboration of Grandfather's concern for M.G.D.'s wellbeing belies the court's legal conclusion that Grandfather's fear was a pretext by which

he alienated M.G.D. from M.G. and E.G.D. As the trial court's legal conclusion that Grandfather's concern was pretextual is unreasonable in light of its factual finding, the trial court abused its discretion in this regard. **See S.W.D., supra** at 400 ("We may reject the trial court's conclusions [that] are unreasonable in light of its factual findings.").

For all of the foregoing reasons, we reverse the trial court's August 19, 2015 custody order. The trial court is directed to clarify the statutory basis of Attorney Kane Brown's appointment; review Mother's request for visitation, whether it be "virtual visitation" or in-person visitation, consistent with the factors our Supreme Court endorsed in **D.R.C.**, **supra**; and review Grandfather's petition for partial physical custody in light of the § 5328 (a) and (c)(1)(i), considerations the court omitted from its prior determination.

Order reversed. Cases remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.

Judge Olson joins the opinion.

Judge Strassburger files a dissenting opinion.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/8/2017

- 45 -