J-S22006-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| S.M., | | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | | |
| v. | | |
| R.J., | | |
| Appellee | | No. 1802 MDA 2016 |

Appeal from the Order Entered October 3, 2016
In the Court of Common Pleas of Susquehanna County
Civil Division at No(s): 2016-397 C.P.

BEFORE:  SHOGAN, MOULTON, and PLATT,[*] JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED APRIL 21, 2017**

S.M. ("Mother") appeals from the order entered October 3, 2016, denying her relocation with the parties' son, E.J. ("Child"), age five, born in January of 2012, from Susquehanna County, Pennsylvania, to Foxworth, Mississippi.  We affirm.

Mother and R.J. ("Father") are not married but lived together on and off, finally separating in the fall of 2012.  N.T., 6/13/16, at 11.  Prior to the instant proceeding, there was no court-ordered custody; the parties proceeded with a custody arrangement by agreement and without court intervention.  Trial Court Opinion, 10/3/16, at 1.  The trial court represents that there is no dispute that the parties have maintained a good relationship

_____

[*]  Retired Senior Judge assigned to the Superior Court.

with each other "even after their separation and have always worked together in raising their son." *Id*. Mother has never sought court-ordered child support from Father "as she never wanted to create any animosity between the parties." *Id*.

The trial court set forth the procedural history of this matter as follows:

On April 25, 2016, Mother filed a custody complaint together with a notice of proposed relocation to . . . Foxworth, Mississippi. Mother did not provide any specific information in her notice of proposed litigation as Mother contended that any relocation was "contingent" upon awarding Mother primary physical custody and approving the proposed relocation. (Relocation Notice). On May 6, 2016, Father filed a counter-affidavit regarding relocation indicating that Father objected to the proposed relocation. On that same date, Mother filed a petition for special relief seeking immediate court approval of her relocation pending a full custody hearing. Likewise, Father filed a petition for special relief contending that Mother had already removed [Child] from Susquehanna County, and sought an interim order that prevented Mother from removing [Child] from Susquehanna County pending a relocation hearing.

On May 11, 2016, the [c]ourt scheduled a hearing on Mother's petition for special relief for June 13, 2016, but the [c]ourt did not enter any interim order that would have permitted Mother to relocate with [Child] to Mississippi prior to any hearing. The [c]ourt likewise scheduled a hearing on Father's petition for special relief for June 13, 2016, and the [c]ourt directed that neither party was to remove [Child] from Susquehanna County without court approval.

On June 13, 2016, the parties appeared to address their cross-petitions for special relief and essentially began submitting testimony related to the underlying relocation question. At the conclusion of that hearing, the [c]ourt denied both parties' petitions for special relief, but permitted Mother "to take [Child] from Susquehanna County for any partial custody and/or visitation purposes to visit the State of Mississippi, as her job will

- 2 -

allow, provided that she does get the minor child back for regular scheduled contact with [F]ather." The [c]ourt then set the matter down for a full custody hearing on June 30, 2016. The parties were unable to conclude their testimony at the June 30, 2016 hearing, and subsequent hearings were conducted on August 8, 2016 and September 22, 2016.[1]

> [1] At the conclusion of the August 8, 2016 hearing, the [c]ourt established a set custody schedule for Father as it was discovered that the intent of the June 13, 2016 Order was not being honored, *i.e.*, Mother had taken [Child] to Mississippi but was not continuing to maintain the former regular schedule of partial custody with Father established between the parties. For this reason, the [c]ourt ordered that Father would have partial custody for a three day period every other week and that Father received one (1) full week of partial custody between August 20 through August 27, 2016.

Trial Court Opinion, 10/3/16, at 1–3.

Following the hearings, the trial court awarded the parties joint legal custody of Child with primary physical custody to Mother and periods of partial physical custody to Father. The trial court denied Mother's relocation to Mississippi. Following the court's denial of Mother's motion for reconsideration on October 25, 2016, Mother filed a timely notice of appeal to this Court on November 2, 2016. Both Mother and the trial court complied with Pa.R.A.P. 1925.

Mother raises the following issues on appeal:

Did the Trial Court commit an abuse of discretion and err as a matter of law by drawing unreasonable inferences and arriving at unreasonable conclusions from the evidence presented, and by ignoring applicable appellate law in coming to those unreasonable conclusions and inferences, such that the Trial

- 3 -

Court's denial of [Mother's] proposed relocation and custody determination amounts to a gross abuse of discretion?

Did the Trial Court commit an abuse of discretion and err as a matter of law by imposing burdens on [Mother] to show that a relocation was in the best interests of [Child] when the burdens utilized in arriving at the Trial Court's decision are unknown in Pennsylvania Law?

Mother's Brief at 3.[1]

In custody cases under the Child Custody Act, ("the Act"), 23 Pa.C.S. §§ 5321–5340, our standard of review is as follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record.

**C.R.F. v. S.E.F.**, 45 A.3d 441, 443 (Pa. Super. 2012) (internal citation omitted). This Court "will accept the trial court's conclusion unless it is tantamount to legal error or unreasonable in light of the factual findings."

_____

[1] Although Mother appears to present two distinct issues in her brief, the argument section of her brief raises one issue with ten subparts, in violation of Pa.R.A.P. 2119 ("The argument shall be divided into as many parts as there are questions to be argued"). In addition, she has failed to comply with Pa.R.A.P. 2116 ("Each question shall be followed by an answer stating simply whether the court or government unit agreed, disagreed, did not answer, or did not address the question"). Nevertheless, we address the issues properly preserved.

*M.G. v. L.D.*, ___ A.3d ___, ___, 2017 PA Super 29, \*5 (Pa. Super. 2017)

(citing *S.W.D. v. S.A.R.*, 96 A.3d 396, 400 (Pa. Super. 2014)).

Section 5328(a) sets forth the best interest factors that the trial court must consider when awarding custody. *E.D. v. M.P.*, 33 A.3d 73, 80–81, n.2 (Pa. Super. 2011). Those factors are as follows:

**§ 5328. Factors to consider when awarding custody**

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

Section 5337(h) sets forth the following ten relocation factors that a trial court must consider when ruling on a relocation petition:

**(h) Relocation factors.—**In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S. § 5337(h).  **_See also E.D._**, 33 A.3d at 81 ("Section 5337(h)

mandates that the trial court *shall* consider all of the factors listed therein,

giving weighted consideration to those factors affecting the safety of the child.") (emphasis in original).

Further, with regard to the custody and relocation factors, we have stated as follows:

> "**All** of the factors listed in [S]ection 5328(a) are required to be considered by the trial court when entering a custody order." *J.R.M. v. J.E.A.,* 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original). Section 5337(h) requires courts to consider all relocation factors. *E.D., supra* at 81. The record must be clear on appeal that the trial court considered all the factors. *Id.*
>
> Section 5323(d) provides that a trial court "shall delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S.A. § 5323(d). Additionally, "section 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen [Section 5328(a) custody] factors prior to the deadline by which a litigant must file a notice of appeal." *C.B. v. J.B.,* 65 A.3d 946, 955 (Pa. Super. 2013), *appeal denied*, [620 Pa. 727], 70 A.3d 808 (2013). Section 5323(d) applies to cases involving custody and relocation. *A.M.S. v. M.R.C.*, 70 A.3d 830, 835 (Pa.Super. 2013). *A.V. v. S.T.*, 87 A.3d 818, 823 (Pa. Super. 2014).
>
> In expressing the reasons for its decision, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *M.J.M. v. M.L.G.,* 63 A.3d 331, 336 (Pa. Super. 2013), *appeal denied*, [620 Pa. 710], 68 A.3d 909 (2013). A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with Section 5323(d). *Id.*

*A.V. v. S.T.*, 87 A.3d 818, 822-823 (Pa. Super. 2014) (emphasis in original). Moreover, "[w]hen a custody dispute involves a request by a party to relocate, we have explained 'there is no black letter formula that easily resolves relocation disputes; rather, custody disputes are delicate issues that

- 8 -

must be handled on a case-by-case basis.'" ***C.M.K. v. K.E.M.***, 45 A.3d 417, 421 (Pa. Super. 2012) (quoting ***Baldwin v. Baldwin***, 710 A.2d 610, 614 (Pa. Super. 1998)).

We have scrupulously reviewed the complete record in this case and have read the notes of testimony. On June 13, 2016, both parties testified. On June 30, 2016, Mother and her fiancé testified. On August 8, 2016, Mother and the maternal grandmother testified, and on September 22, 2016, both parties, the paternal grandmother, and a paternal aunt testified. We have carefully considered the arguments of the parties as well as the applicable law. We conclude that the trial court has thoroughly and correctly analyzed the evidence and applied it to this matter. We affirm the October 3, 2016 order on the comprehensive opinion of the Honorable Jason J. Legg, who provided analysis of all of the relocation factors set forth at 23 Pa.C.S. § 5337(h), as well as the general best interest custody factors set forth at 23 Pa.C.S. § 5328(a).[2,3] We make the following additional observations.

The over-arching theme in Mother's brief is that the trial court "focused too much attention," or "did not place enough emphasis" on particular relocation factors. Mother's Brief at 15. This Court does not

---

[2] Mother, who was awarded primary physical custody despite the denial of relocation, has not challenged any of the factors set forth in Section 5328 of the Act.

[3] We direct the parties to attach a copy of the trial court's opinion in the event of future proceedings.

reweigh the factors; our role does not include making independent factual determinations. *C.R.F.*, 45 A.3d at 443. Indeed, we defer to the trial court's factual findings that are supported by the record and its credibility determinations. *M.G.*, ___ A.3d at ___, 2017 PA Super at 29, *5. We reaffirm that in a relocation case, as in any custody case, the paramount concern remains the child's, not the parent's best interest. We are reminded of the Court's comments in a custody case that pre-dated the Act, but that remain particularly apt:

> It is beyond the belief of this court that any parent would petition to relocate their children if said relocation would not contribute to the personal happiness and emotional well-being of the petitioning parent. If these particular benefits to the relocating parent were to carry such weight alone, few relocations petitions would demand much attention and time by the court, few would be denied, and the best interest of the children would take a back seat to the best interests of the relocating parent in virtually every case.

*Graham v. Graham*, 794 A.2d 912, 917 (Pa. Super. 2002). Instead, as it was required to do, the trial court considered **all** of the factors required by 23 Pa.C.S. § 5337(h) and concluded that Mother's relocation with Child should be denied. The trial court's conclusions do not involve any error of law and are not unreasonable in light of its sustainable findings. Thus, we will not disturb them on appeal.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/21/2017



IN THE COURT OF COMMON PLEAS OF
SUSQUEHANNA COUNTY, PENNSYLVANIA

S███ M████,

      Plaintiff,

VS.

R████ J███████,

      Defendant.

No. 2016-397 C.P.

## OPINION

### I.    Background

Plaintiff S███ M████ (hereinafter referred to as Mother) and defendant R███ J███████ (hereinafter referred to as Father) have one child, ██████████████ (hereinafter referred to as E.J.), date of birth, January ██, 2012. The parties separated in the fall of 2012, but this Court has never entered any custody order relative to E.J. as to the parties were able to amicably work out a custody arrangement. Mother contends that Father sees E.J. one or two days per week, while Father has submitted a calendar exhibit that evidenced far more substantial and meaningful contact with E.J. (Resp. Ex. 2.) There is no dispute that the parties have maintained a good relationship with each other even after their separation and have always worked together in raising their son. Mother has never sought any court ordered child support from Father as she never wanted to create any animosity between the parties.

On April 25, 2016, Mother filed a custody complaint together with a notice of proposed relocation to ███████████ Foxworth, Mississippi. Mother did not provide any specific information in her notice of proposed litigation as Mother contended that any relocation was "contingent" upon awarding Mother primary physical custody and approving the proposed relocation. (Relocation Notice). On May 6, 2016, Father filed a

1

counter-affidavit regarding relocation indicating that Father objected to the proposed relocation. On that same date, Mother filed a petition for special relief seeking immediate court approval of her relocation pending a full custody hearing. Likewise, Father filed a petition for special relief contending that Mother had already removed E.J. from Susquehanna County, and sought an interim order that prevented Mother from removing E.J. from Susquehanna County pending a relocation hearing.

On May 11, 2016, the Court scheduled a hearing on Mother's petition for special relief for June 13, 2016, but the Court did not enter any interim order that would have permitted Mother to relocate with E.J. to Mississippi prior to any hearing. The Court likewise scheduled a hearing on Father's petition for special relief for June 13, 2016, and the Court directed that neither party was to remove E.J. from Susquehanna County without court approval.

On June 13, 2016, the parties appeared to address their cross-petitions for special relief and essentially began submitting testimony related to the underlying relocation question. At the conclusion of that hearing, the Court denied both parties' petitions for special relief, but permitted Mother "to take the child from Susquehanna County for any partial custody and/or visitation purposes to visit the State of Mississippi, as her job will allow, provided that she does get the minor child back for regular scheduled contact with the father." The Court then set the matter down for a full custody hearing on June 30, 2016. The parties were unable to conclude their testimony at the June 30, 2016 hearing, and subsequent hearings were conducted on August 8,

2

2016 and September 22, 2016.[1] The record is now closed and the matter is ripe for disposition.

II.     Discussion

a.  Standard of Review

The paramount question in any custody proceeding is what custody arrangement provides for the best interest of the child.  See W.C.F. v. M.G., 115 A.3d 323, 326 (Pa. Super. 2015).  "The best-interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well-being." D.K.D. v. A.L.C., 141 A.3d 566, 572 (Pa. Super. 2016)(quoting Saintz v. Rinker, 902 A.2d 509, 512 (Pa. Super. 2006)).  When considering whether a proposed relocation is in a child's best interest, the Court must review 10 statutory factors under 23 Pa. C.S. § 5337(h), as well as the 16 factors enumerated in 23 Pa. C.S. § 5328(a) as it relates to an award of custody.

"The party proposing the relocation has the burden of establishing that the relocation will serve the best interest of the child . . . ." 23 Pa. C.S. 5337(i); see D.K.D., 141 A.3d at 573 ("As the custodial parent seeking to relocate with L.D., Mother had the burden of establishing that relocation is in her son's best interest."); cf. Klos v. Klos, 934 A.2d 724, 728 (Pa. Super. 2007)("Where a custody order exists prior to the petition to relocate, the parent who desires to relocate bears the burden of proving [that relocation is in the best interests of the child].").  Given that Mother is seeking the proposed

---

[1]     At the conclusion of the August 8, 2016 hearing, the Court established a set custody schedule for Father as it was discovered that the intent of the June 13, 2016 Order was not being honored, i.e., Mother had taken E.J. to Mississippi but was not continuing to maintain the former regular schedule of partial custody with Father established between the parties.  For this reason, the Court ordered that Father would have partial custody for a three day period every other week and that Father received one (1) full week of partial custody between August 20 through August 27, 2016.

3

relocation, Mother bears the burden of demonstrating by a preponderance of the evidence that the proposed relocation to Mississippi is in the best interests of E.J.[2]

b. Relocation Factors – 23 Pa. C.S. § 5337(h)

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

Both parties have been substantially involved in E.J.'s life and have shared parental duties. Mother has been the primary caregiver for E.J. and she has a close relationship with E.J. Mother worked very hard to assure that Father established a close relationship with E.J. Mother has provided transportation to make sure that E.J. sees Father, Mother and her family have opened their home to Father during holidays so that Father can spend additional time with E.J. aside from his normal periods of partial custody. Mother allowed Father to come to her residence to spend time with E.J. to perform parental duties, such as giving E.J. a bath, getting E.J. ready for bed, and reading E.J. a bedtime story. Father presented an exhibit that demonstrated that he was seeing E.J. approximately fifty (50%) percent (or more) of the time – whether during his own periods of partial custody or during periods when he would go to Mother's residence to spend time with E.J. (Resp. Ex. 2.) As between the parents, this factor is neutral as the record plainly demonstrates that both parties have a close and meaningful relationship with E.J.

---

[2]     "Relocation" is defined as follows: "A change in a residence of the child which significantly impairs the ability of a nonrelocating party to exercise custodial rights." 23 Pa. C.S. § 5322. Mother has conceded that this case involved a relocation as she filed notice of relocation as required under 23 Pa. C.S. § 5337(c). The proposed relocation to Mississippi is plainly the type of geographic move that would constitute a relocation under the definition provided in § 5322.

4

The parties have no other children so there are no siblings relationships implicated in this case.[3] As to other significant parties, the record demonstrates that E.J. has extensive familial relations here in Susquehanna County. Mother resides with her Mother, Mary Williams, and her step-father, Mark Williams. Mother testified that E.J. had a close relationship with both parties, but that E.J.'s relationship with his maternal grandmother was very close. Along with her parents, Mother is also residing with her 19-year old brother at their parents' residence. Likewise, two of Mother's sisters live in or around her parents' residence, Molly (19) and Emily (27). Mother testified that her sisters see E.J. on a weekly basis and that they have a very close relationship with him. Significantly, Emily has two sons of her own – Lyle (5) and Darrin (2). E.J. has a close relationship with his cousins, especially with Lyle who is close to the same age.

Likewise, Father has a sister, S██ J██████, who resides near Montrose and sees E.J. every few weeks. S███ testified that she had a very close relationship with E.J. that would be detrimentally impacted if her nephew was allowed to relocate. The remainder of Father's family lives in New Jersey approximately 2 to 3 hours away, but the testimony was that the distance did not prevent them from having regular contact with E.J. approximately once every three to six weeks. These periods of visitation

---

[3]     Mother revealed at the August 8, 2016 hearing that she was pregnant and that she was "probably about six to eight weeks" into her new pregnancy. (N.T., Aug.8, 2016, at 26.) At the September 22, 2016 hearing, Mother testified that she was 20-weeks into her pregnancy. When pressed on how far along she was in the new pregnancy, Mother changed her answer to 16 weeks. When the Court questioned her as to her due date, she did not provide an immediate answer to that question, but later indicated that she believed it was in March 2017, which would be more consistent with her pregnancy being closer to 16 weeks than 20 weeks. Mother contended that she has not been receiving any consistent OB-GYN care to this point, but had visited a "clinic" on two occasions. Despite the vagueness and inconsistency of this testimony, Father has not contested the fact that Mother is pregnant, but it is also clear that E.J. does not yet have a born sibling with which to interact.

5

occurred when Father takes E.J. to New Jersey to see them or when they come to Susquehanna County to see Father and E.J.

In contrast, E.J. has no significant connections with any parties in Mississippi. Mother is engaged to Terry Tolar (hereinafter referred to as Tolar), but this engagement was just announced in January 2016.[4] No marriage has yet occurred. Mr. Tolar has family in Mississippi, but they are not related to E.J. Mother contends that these people are significant people in E.J.'s life because E.J. has gone to Mississippi to visit with them and they will soon be his extended family as a result of her anticipated marriage. It was estimated that E.J. has gone on 20 visits to Mississippi since Mother and Tolar began dating. Tolar has four grandchildren who are close in age to E.J. and E.J. has established some kind of relationship with them as a result of his visits. If the marriage occurs, Tolar's grandchildren would become E.J.'s step-niece and nephews even though some of these children are actually older than E.J.

In weighing this factor, Mother has failed to meet her burden of proof of demonstrating that this factor weighs in favor of the proposed relocation. The vast majority of E.J.'s extended family (and other significant persons in E.J.'s life) live in and around Susquehanna County. While there may be potential new family members residing in Mississippi, these people simply do not have the history or connections that the local family members have with E.J. As such, this factor weighs against relocation and in favor of Father's position.

---

[4] Tolar does not reside in Mississippi as he works for a pipeline company that requires him to move around the country for his work. Tolar spent the past four years in Susquehanna County but completed his assignment here in November 2015. Tolar is currently working in Florida on a project which he believed would involve approximately 10 months of work. As such, Mother's proposed relocation would be to Mississippi under circumstances where her fiancé will not even be present in the home for the majority of the time but only be present on weekends or other days off.

6

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

E.J. is 4 years of age. He has not yet attended a public school setting, but did attend a private pre-school in Hop Bottom, Pennsylvania last school year. Mother testified about the different pre-school settings that were available in Mississippi, but there was no evidence presented to demonstrate that any of those programs were superior to the schooling available in Susquehanna County. Moreover, there was no evidence as to whether the elementary schooling in Mississippi is better than the schooling available here in Susquehanna County. As such, the record fails to disclose that Mississippi is a better location for purposes of E.J.'s educational needs.

Further, there was no evidence that Mississippi would better serve E.J.'s physical needs. As to his emotional development, there was testimony that Mother is concerned that her relationship with Tolar will be adversely impacted if she is not permitted to move to Mississippi. It is suggested that Mother and E.J. will have less contact with Tolar if relocation is denied. On the other hand, Tolar's employment sends him to different geographic locations, he worked in Susquehanna County and now he has work in Florida for the next 10 months. During that time, Tolar will not be with Mother and E.J. except on the occasions when his employment allows him to travel back to Mississippi. Tolar cannot predict with any certainty where his next work assignment will take him. While a move to Mississippi will allow Mother and E.J. to potentially spend some more time with Tolar, it is not clear exactly how substantial that period of time will be – and whether it will continue beyond his current work assignment.

7

As to Susquehanna County, E.J. has established strong familial roots. On Mother's side, nearly her entire family resides here. Mother actually lives with the maternal grandmother and maternal step-grandfather. She has sisters who live in close proximity as well as E.J.'s young cousins to whom he has developed a close relationship. Further, Father is here in Susquehanna County along with E.J.'s maternal aunt – and Father's family is only a few hours trip from seeing E.J.

In terms of E.J.'s emotional development, it is clear that Susquehanna County has a strong support system that can assist him in his daily routine. There are no such guarantees in Mississippi. Mother has failed meet her burden of proof and this factor weighs in favor of Father and against relocation.

> (3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

The proposed relocation is an extraordinary distance. It takes between 16 and 20 hours to drive the trip between Mother's Pennsylvania residence to her new Mississippi residence. In order to fly, Mother still needs to travel from her Pennsylvania home to an airport, 45 minutes to Avoca and 2 to 3 hours to get to Newark or Philadelphia, followed by a three hour flight, and another 1 to 2 hours of driving upon reaching Mississippi. Thus, even when utilizing a commercial airline, the travel time still takes between 5 to 10 hours of travel time. The distance is such that there is no real logistical way to continue any kind of similar custody arrangement between Father and E.J. if relocation is granted.

Mother contends that she will continue to regularly visit Susquehanna County and that she will allow Father to see E.J. during those periods of time. As noted, nearly

8

all of Mother's extended family lives in Susquehanna County so Mother does have a good reason to travel back and forth between Pennsylvania and Mississippi. The frequency of these visits is unknown – and the importance of E.J. not only seeing his Father but Mother's extended family must also be considered. In other words, even with "frequent" visits back and forth to Susquehanna County, the time that E.J. spends with Father and his maternal extended family will be severely impacted.

Mother also contends that she would provide Father with most of the summer months to make up for his loss of custody. Father currently sees E.J. on a very consistent basis primarily based upon his work schedule. Even when he is working, Father will come over to Mother's house to be with E.J., read to him, bathe him or put him to bed. Father spends a substantial amount of time with E.J. which, prior to Mother's relocation, was close, if not greater, than 50% of the time. (Resp. Ex. 2.)[5] Mother's proposed alternate summer visitation schedule would not substantially benefit Father when compared to the current custody arrangement which allows for Father to see the child around his work schedule, which is swing schedule that allows him to work 3 days, be off 3 days, work 4 days, then off 3 days, work three days, and then off 4 days. Father has spent substantial amounts of time with E.J. The relocation will necessarily result in a substantial reduction in the time that Father spends with E.J. Even if Father received the majority of the summer vacation period, it would not result in

---

[5]    Mother contends that E.J. is with her 80% of the time and with Father 20% of the time. Father disputed this calculation and prepared his own calendar to demonstrate the dates and times that he spent time with E.J. While the Court recognizes that Father recreated this calendar from digital photographs and similar electronic records, Mother was unable to rebut many of Father's claims. For instance, Mother contended that Father could not have seen E.J. during the middle of February, but upon cross-examination, Mother conceded that she did come back to Susquehanna County in the middle of February and Father saw E.J. during that period of time. While Father's record likely contains some mistakes, it certainly speaks to a custody arrangement that is far different than the 80/20 arrangement that Mother described.

9

a similar amount of time with E.J. as Father will be working during the summer months and unavailable to E.J. as a result of his work schedule.

E.J. and Father have a very close relationship that the proposed relocation will necessarily impact in a negative way. Indeed, Father testified that he has already seen differences in E.J.'s behavior after Mother spent most of the summer in Mississippi. Given the distance between the parties, there are no accommodations that would adequately preserve the nature of their strong and close relationship. Instead, the relocation will cause E.J. to have substantially less contact with Father and thereby threaten to weaken the strong relationship between Father and E.J.

For these reasons, Mother has failed to meet her burden of proof to demonstrate that it would be feasible to maintain the strong relationship between Father and E.J. based upon suitable alternate custody arrangements. If relocation is allowed, Father's time with E.J. will be substantially limited and Mother has not proposed any alternative custody arrangement that would even come close to maintaining the constant and frequent contact that Father and E.J. currently enjoy. For these reasons, this factor weighs in favor of Father and against relocation.

> (4) The Child's preference, taking into consideration the age and maturity of the child.

Given E.J.'s tender years, he did not testify in this proceeding. As such, there is no evidence as to E.J.'s preference. For this reason, this factor was not considered.

> (5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child with the other party.

There is no evidence that either party has ever engaged in any conduct aimed at thwarting the relationship between E.J. and the other party. On the other hand, there is

10

ample evidence that Mother has worked diligently to promote the relationship between Father and E.J. Mother provided transportation to assure that Father received E.J. Mother allowed Father to come to her personal residence and care for E.J., such as bathing him, reading to him and getting him into bed. Mother invited Father to come to her residence for holidays and spend the time together as a family with E.J. Mother never sought child support from Father because she did not want to create any animosity between the parties. Mother stated that she wanted to work things out and avoid court proceedings. As a result of Mother's commendable efforts, the parties never had to resort to any court involvement until Mother's proposed relocation.

There is nothing on this record to suggest that Father engaged in similar level of conduct. Father certainly worked with Mother and engaged in activities that some separated couples would not do, i.e., Father would spend holidays at Mother's residence and would go to Mother's residence to care for E.J. While Mother allowed Father to engage in this conduct at her residence, Father should also be credited with recognizing that it was in E.J.'s best interests to see his Mother and Father getting along and working together. As to this factor, however, the record clearly demonstrates that Mother has engaged in extraordinary efforts to promote the relationship between Father and E.J. As noted earlier, Mother's efforts have been successful as Father and E.J. have a close relationship. For these reasons, this factor also weighs in favor of Mother and supports relocation.[6]

---

[6] As will be noted later in this opinion, the Court has concerns about Mother's continued commitment to encouraging and supporting Father's relationship with E.J. These concerns center around Mother's attitude toward her sense of entitlement to relocate regardless of Father's position, coupled with 2 absolutely terrible text messages that Mother sent to Father in response to his opposition to her proposed relocation.

11

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

Mother contends that she is relocating based upon a job opportunity to be a campground manager that would pay her $40,000 per year. (Pet. Ex. 1.) The initial starting date was to be June 1, 2016. (Pet. Ex. 1.) The campground is owned by Mother's fiancé and his son apparently in equal shares. Tolar testified that the campground has 77 lots, a pool and a playground. It was a pre-existing business which was purchased out of a foreclosure proceeding. Tolar testified that the campground had been in business for 15 to 18 years, but the record fails to disclose why it went into foreclosure. Tolar testified that he viewed the campground as a retirement vehicle, but also conceded that he planned on working in his current field for another 6 years.

There was no evidence presented as to whether this campground was a viable business entity. The only evidence concerning the finances of the campground related to the fact that it was purchased from the previous owners in a foreclosure proceeding from which it can reasonably be inferred that the revenue from the campground were insufficient to cover the debt or that it was not managed properly by the prior business owners. Tolar did not present any business plan to describe the planned operation of the campground. Tolar did not present any budget with projected revenues and expenses to explain how Tolar determined that a rate of pay of $40,000 per year for a campground manager was sustainable. Even though the campground had been in operation for several months, there were no financial statements or records submitted to demonstrate that the economic viability of this economic venture. Finally, even after Mother was permitted to go to Mississippi over the summer and worked at the

12

campground, Mother never supplemented the record to demonstrate what she was earning at the campground. Mother offered none of her paychecks to demonstrate that she was actually employed at the campground and was receiving compensation for her work.

Mother has a G.E.D. and obtained her license to be a certified nurses' aid (C.N.A.). When Mother was working as a C.N.A., she was earning $11.80 per hour, which would equate into approximately $25,000 per year wage. Mother has not worked as a C.N.A. since 2012, and Mother testified that she had allowed her C.N.A. certification to expire. Mother did start her own business which involved removing erosion control devices placed by the natural gas industry, and Mother testified that she earned a net pay of $30,000 in 2015 running that business. Mother contended that the business was no longer viable as a result of the downturn in natural gas activities in Susquehanna County.

Mother's employment in 2015 in Susquehanna County generated net income approximately similar to what she will receive from her fiancé campground, namely she had a *net* pay of $30,000 last year in Susquehanna County and obtained a new employment opportunity for a salaried position of $40,000 per year *gross* pay in Mississippi. There is no significant difference in terms of income between her employment in Susquehanna County in 2015 and her new employment in Mississippi for 2016.

Mother contends that her prior business can no longer operate as a result of an economic downturn in natural gas related activities in Susquehanna County. The record suggests that Mother's 2015 business employment was a result of her fiancé's

13

connections within the natural gas industry. Now that his work is done here and he has moved on to employment in Florida, Mother's business is no longer a viable enterprise.

Aside from her cottage natural gas industry business in 2015, Mother admittedly has not worked in Susquehanna County since 2012. Mother admitted that she made no effort whatsoever to seek any kind of comparable employment in or around the Susquehanna County area. Mother developed no record whatsoever as to the employment opportunities that would be available to her in Susquehanna County. As noted early, Mother previously had a professional certification that allowed her to earn approximately $25,000 per year – and those were wages that were paid for that position 4 years ago.[7] Mother has failed to meet her burden of proof to demonstrate what her current earning capacity would be if she sought gainful employment in Susquehanna County (or the surrounding area).[8] See D.K.D., 141 A.3d at 577 (finding that Mother seeking relocation had "neglected to make a sincere, unencumbered effort to find employment in Pennsylvania . . . to avoid removing [the child] from his stable environment and steady routine").

Moreover, the record is equally lacking as it relates to the cost of living in Mississippi. Mother contends that she will be earning substantially more money in Mississippi than she is capable of earning in Susquehanna County. As noted, Mother has not presented any evidence of any efforts to seek employment in the Susquehanna

---

[7]    For instance, Father lost his employment at Montrose Beverage over one year ago where he was earning $9.80 per hour, but Father was able to obtain new employment at the rate of $12.80 per hour. Assuming 40 hours per week, Father is now earning around $26,500 per year. There is no indication that Father had any difficulty finding new employment with substantially better pay from his previous employment.

[8]    The Court recognizes that Mother has allowed her C.N.A. license to expire such that she may not be immediately able to seek a position as a C.N.A. The record fails to demonstrate that Mother would not be capable of renewing her C.N.A. license without significant difficulty. But even assuming that Mother could not do so, the record is still devoid of any evidence that Mother sought any employment in this geographic area.

14

County area since 2012. Even if the Court were to consider Mother's last employment as a C.N.A. with an annual wage of approximately $25,000, there is no way for the Court to assess the real value of $25,000 in Susquehanna County against the value of $40,000 in Mississippi. The record lacks any evidence that would provide a meaningful comparison between the wages when compared with the cost of living in both locales. It was Mother's burden to present this evidence and she failed to do so.[9]

Finally, the one area where Mother was able to present some evidence in support of this factor would be that the proposed relocation would benefit Mother's emotional quality of life. Mother is now separated from her fiancé and soon to be father of her unborn child. While it is true that Mother's proposed relocation would bring her closer to Tolar, it would not reunite them as Tolar now works in Florida, not Mississippi, and Tolar estimated that this work would continue for another 10 months. Tolar testified that he has another 6 years until he retires from his work in the natural gas industry. There is absolutely no way to know where Tolar will be assigned after his Florida work is completed. At this point, the Court only knows that Tolar will currently be working in Florida while Mother would be living in Mississippi managing a fledgling campground business devoid of any of her extended family support.[10]

---

[9] Moreover, any financial gains associated with Mother's relocation would necessarily be substantially eroded by the need for transportation to and from Susquehanna County to enable Father to have his periods of partial custody of E.J. Father certainly lacks significant financial resources that would allow him to regularly travel to Mississippi for purposes of seeing E.J. Mother contends that she plans on being in Susquehanna County approximately one time per month and the costs of this amount of travel will not be insignificant. After the travel costs are factored into the calculation, Mother's new employment does not provide a substantial financial benefit. If the cost of living in Mississippi is greater than in Susquehanna County, then it is actually likely that there is no financial benefit from Mother's proposed relocation.

[10] Mother contends that Tolar has extended family in Mississippi that can provide her with support. The stark reality remains that Mother and Tolar are not married. While Tolar and Mother certainly appear committed to each other, the fact remains that Tolar's relatives are not yet Mother's relatives. To the extent that Tolar's relatives are a support group for Mother, this level of support is at best a neutral factor as Mother has the same level of support available here in Susquehanna County from her family.

15

Counsel for Mother suggested during argument that the Court would be "driving a wedge" between the relationship of Tolar and Mother if relocation were not approved. While the Court appreciates the difficulties of any long distance relationship, the fact remains that Mother and Tolar will not be together even if relocation is approved and Mother and E.J. will be in a wholly new geographic location devoid of any familial relations. It is not clear what "wedge" would be driven between the parties as a result of the denial of any proposed relocation. Tolar knew that Mother had a child when he began dating her. Tolar knew that Father played a significant role in E.J.'s life. Tolar decided to pursue a relationship with Mother knowing that she had significant ties to Susquehanna County that would restrict her ability to simply pick up and move to another geographic area. Likewise, Mother knew that Tolar worked in the natural gas industry and that his employment was transient from one geographic area to another geographic area. Thus, the difficulties in Mother's relationship with Tolar were not created by the Court – and the central issue in this custody proceeding is what is in the best interest of E.J. – not necessarily Mother and Tolar.

In the end, this gist of this entire relocation action involves Mother's understandable desire to remain in a relationship with her new fiancé.[11] If counsel's argument is accepted, the denial of relocation will result in a termination of the relationship between Tolar and Mother, i.e., counsel's proverbial "wedge." Of course, Mother's counsel argument applies with equal, if not greater force, when applied to the relationship between Father and E.J. in that this proposed relocation would likely "drive

---

[11]     The parties became engaged in January of 2016 and Mother made the relocation decision shortly after their engagement.

16

a wedge" between the close relationship that Father and E.J. now enjoy as a result of the substantial amount of time that Father spends with E.J.

Mother has simply failed to demonstrate on this record that her new proposed employment is a sustainable and viable employment opportunity. The campground is a fledging business which was just purchased out a foreclosure action. The record fails to disclose that any business plan has been developed or how the new business plans on sustaining Mother's position at $40,000 per year. No budget was submitted, no monthly financial statements were produced, and Mother failed to even produce a single paystub to substantiate her claim regarding her employment opportunity. Moreover, the record is likewise devoid of any evidence as the relative differences in the cost of living in Mississippi when compared to Susquehanna County. For these reasons, Mother has failed to meet her burden of proof as it relates to the financial benefits associated with her relocation.[12]

Mother has presented evidence to suggest that the relocation would generally improve her emotional quality of life simply by virtue of her being allowed to be in closer proximity to her fiancé. Given that Tolar does not work in Mississippi and his employment will continue to be transient for the next 6 years, Mother's relocation will not assure that she spends substantially more time with Tolar if she lived in Mississippi or if she lived in Pennsylvania. While the Court questions the emotional benefits that Mother will receive as a result of the proposed relocation to a geographic area with no family

---

[12]     There is nothing on this record to suggest that Mother has any campground management experience – or really any business management experience whatsoever. The business that she ran in Susquehanna County was created through her fiancé and connected to his work in the natural gas industry. The record fails to disclose how her operation of that particular business equates to campground management. Given the lack of evidence as to the business plan for this campground, it operating budget, and its current financial condition, the Court has reservations about approving a relocation based upon an employment opportunity conditioned upon the success of a fledging campground business being managed by someone with no relevant work experience.

17

support and a fiancé who visits at best on weekends, Mother's testimony made it clear that she was emotionally committed to the proposed relocation. As such, this factor weighs slightly in favor of Mother.

> (7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

There is no evidence that the proposed relocation will enhance the general quality of life for E.J. As noted previously, Mother has failed to demonstrate that the financial quality of life of E.J. would be improved if relocation was approved.[13] Moreover, there was no evidence submitted that the educational opportunities available in Mississippi are superior to those available in Susquehanna County. Finally, there is nothing on this record to suggest that there would be an emotional benefit to E.J. if relocation were approved. To the contrary, the proposed relocation would remove E.J. from his established routine of consistent and meaningful periods of partial custody with Father as well as with E.J.'s entire extended family.

For these reasons, Mother has failed to bear her burden of proof as to this factor. For this reason, this factor weighs in favor of Father.

---

[13] Tolar testified that he had been supporting Mother and E.J. for the past several years without aid or assistance from Father. Tolar contended that Father was not capable of supporting E.J. on his own based upon Father not making as much money as Tolar. The record, however, demonstrates that Father, while living modestly, has been able to support E.J. during the periods of partial custody that he has had with his son. Regardless of the different earning capacities between Father and Tolar, there was no testimony that Tolar would leave Mother if she was not able to relocate to Mississippi. Tolar's assertions that he can provide a better financial life for E.J. and Mother have no relevance to the relocation request *unless* Tolar's love and affection for Mother is conditioned upon her relocation to Mississippi. If this is true, then Tolar is not truly committed to either Mother or E.J.

### (8) The reason and motivation of each party for seeking or opposing the relocation.

Mother's relocation is primarily motivated by her relationship and recent engagement to Tolar and the need to sustain and grow that relationship.[14] Mother is not seeking to relocate in order to thwart or otherwise injure the relationship between Father and E.J. Likewise, Father's opposition to the relocation is likewise made in good faith. Mother's proposed relocation will necessarily "drive a wedge" between the relationship between Father and E.J. and substantially impair the ability of E.J.'s entire extended family to have meaningful contact with him. Thus, both parties are motivated by appropriate reasons for their positions.

Unfortunately, Mother has reacted poorly to Father's opposition to the proposed relocation. In one of her text messages to Father, Mother lashed out:

> You had you weasel lawyer file some bullshit underhanded shit saying I moved here when you know I didn't., you're a dick, and jealous because I am trying to better ███ and my life.

(Resp. Ex. 2.) In another text message, Mother continued her tirade against Father:

> You don't give a fuck about me or ███ You're just a selfish prick. You've never done anything to support either one of us. You use him because you're lonely and pathetic. He's not even you're kid.

(Resp. Ex. 1.) Mother's outbursts against Father's objection to this proposed relocation are both telling and problematic. Mother's animosity toward Father undermines the sincerity of her motivation to relocate to Mississippi. It demonstrates that Mother has not seriously considered the ramifications that the relocation would have upon the relationship between Father and E.J. These text messages demonstrate that Mother

---

[14]    Mother's recent unplanned pregnancy has only added to her desire to be closer to Tolar, the father of her future child.

19

feels some level of entitlement to relocate with E.J. regardless of how it will impact the relationship between Father and E.J.

Given the content and tenor of these text messages, Mother has failed to demonstrate that this factor weighs in her favor. Therefore, this factor also weighs against any relocation.

> (9) The present and past abuse committed by a party or a member of the party's household and where there is a continued risk of harm to the child or an abused party.

There is no evidence of any abuse whatsoever by either party. As such, this factor was not considered.

> (10) Any other factor affecting the best interest of the child.

Neither party has brought to the Court's attention any other factors that should be considered relative to this relocation petition. Nor does the record disclose any other factor that the Court should consider relative to relocation. For this reason, no other relocation factor was considered.

### c. Conclusion as to the Relocation Factors

Mother has failed to meet her burden of proof to demonstrate that relocation factors weigh in favor of moving E.J. to a wholly different geographic area. In this regard, Mother has sustained her burden of proof on only 2 out of the 10 relocation factors, and one of those factors only weighs slightly in her favor. Conversely, Mother has failed to demonstrate sufficient proof to demonstrate that 4 out of the 10 relocation factors support relocation, and, as such, these factors weigh in favor of Father. One out

20

of the 10 factors was neutral between the parties, while 3 of the factors were not considered as there was no evidence presented to support those factors. After consideration of the statutory factors, Mother has failed to present sufficient evidence to demonstrate that relocation is in the best interest of E.J.

This does not end the inquiry as the Court must also consider the 16 enumerated factors under 23 Pa. C.S. § 5328(a) in order to make a custody award. As will be noted, these factors also weigh against Mother's proposed relocation.

### d. General Custody Award Factors

> **(1) § 5328(a)(1): Which Party is more likely to encourage and permit frequent and continuing contact between the child and another party.**

The record demonstrates that Mother has worked to maintain a strong and close relationship between E.J. and Father. Mother has not only provided transportation to assure that Father has contact with E.J., but she has also opened her home up for Father to come and spend additional time with E.J. even when it is not his period of partial custody. Likewise, Father has cooperated with Mother to facilitate a meaningful custody arrangement where both parties have spent substantial time with E.J. Up to this point, the parties have not required any court order to govern the relationship between them. They have been a model of co-parenting for the best interests of E.J.

Since Mother's summer relocation, however, issues have arisen that have interfered with Father's time with E.J. Prior to Mother's decision to relocate Father was seeing the child on a nearly equal basis. (Resp. Ex. 2.) When Mother relocated to Mississippi this summer prior to final court approval, Father saw E.J. on a very limited

21

basis.[15] Father only saw E.J. on 4 occasions from June 30 through August 19 – a period of a month and a half. Mother contended that if she relocated that she planned on providing Father with a majority of the summer vacation, but when faced with the opportunity to demonstrate her commitment to such an arrangement, Mother failed to provide any meaningful contact for Father over a substantial period of this summer. Moreover, for a period of 10 days while she was in Mississippi, Mother broke her telephone which interfered with Father's ability to contact E.J.

Further, the Court cannot gloss over the very disturbing text messages that Mother sent to Father in response to Father's opposition to her relocation. Aside from the derogatory language and names used toward Father in those text messages, Mother went as far as to suggest that E.J. was "not even [Father's] kid." If this was something that was said in the heat of a verbal argument, it would still be reprehensible. For Mother to actually have the time to consider and type these words out before sending them to Father demonstrates a level of reflection on the hateful nature of her speech which is only bolstered by the conscious choice to send such a terrible message.

Historically, both parties have worked hard to encourage and permit frequent contact between E.J. and the other party. Mother's recent conduct and disturbing text messages call into question her continued commitment to work toward maintaining that level of frequent and continuing contact between E.J. and Father. For these reasons, this factor weighs in favor of Father.

---

[15] The Court initially allowed Mother to take E.J. to Mississippi provided it did not interfere with Father's regularly scheduled contact with E.J. Mother wholly ignored this directive when she moved to Mississippi at the end of June 2016 and Father's contact with E.J. essentially terminated until the following hearing date in the middle of August 2016. (Resp. Ex. 2.)

22

(2) § 5328(a)(2): The present and past abuse committed by a party of member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child."

There is no evidence that either party has engaged in any abuse whatsoever. For this reason, this factor was not considered.

(3) § 5328(a)(3): The parental duties performed by each party on behalf of the child.

As noted, Mother has been the primary caregiver for E.J. throughout his life. Father has played a substantial role in E.J.'s life and has maintained consistent and substantial contact with E.J. Prior to the proposed relocation, the parties worked hard together to assure that E.J. had substantial contact with Father. Mother invited Father to family functions and holidays at her residence – and Father agreed to attend – so that E.J. could spend time with both parents. Mother also allowed Father to come to her residence and watch E.J., get him bathed, read to him, and put him to bed. Father submitted an exhibit that evidenced that he had contact with E.J. at least (if not more) than 50% of the time. Thus, each parent has demonstrated that they have performed parental duties for E.J.

As the primary caregiver, Mother has generally been the party who has performed the bulk of the caregiving duties for E.J. While Father admittedly has a very large role in E.J.'s life, this factor weighs in favor of Mother.

23

(4) § 5328(a)(4): The need for stability and continuity in the child's education, family life and community life.

E.J. has established strong roots in Susquehanna County. E.J. is blessed to have a large extended family in Susquehanna County – or within close driving distance to Susquehanna County. Mother and Father have worked together so that E.J. has both stability and continuity in his life. Mother testified that she would drive E.J. to Father's residence when necessary to make sure that the relationship between E.J. and Father was maintained. E.J. attended a local pre-school, but is not yet old enough for public schooling. E.J. has adapted well to a schedule that allows him to have substantial time with both parents. By all accounts, E.J. has thrived under the current arrangement. For this reason, this factor does not weigh in favor of either party, but was addressed to a large degree as to why relocation is not in the best interest of E.J.

(5) § 5328(a)(5): The availability of extended family.

Mother has a large extended family here in Susquehanna County. Father has a sister who lives in close proximity – and Father's parents live in New Jersey, which takes approximately a few hours to get to Susquehanna County. E.J. has consistent and meaningful contact with all of these people – and resided for a period of time with his maternal grandparents. Given that Mother has a larger extended family in Susquehanna County, and the record demonstrates that E.J. has a very close relationship with his maternal grandmother with whom he resided, this factor weighs in favor of Mother for purposes of a custody award.

24

> (6)     § 5328(a)(6): "The child's sibling relationships."

K.C. does not have any siblings. For this reason, this factor was not considered.[16]

> (7)     § 5328(a)(7): "The well-reasoned preference of the child, based on the child's majority and judgment."

The child did not testify. This factor was not considered.

> (8)     § 5328(a)(8): "The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm."

There was no evidence of any attempt by either parent to turn the child against the other parent. As noted earlier, however, there is very disturbing evidence relative to Mother's derogatory text messages to Father, which involved vulgar name calling and maliciously hurtful statements directed toward Father.[17] Aside from these text messages, and prior to the proposed relocation, Mother plainly worked hard to make Father an important and vital part of E.J.'s life.

At this point, there is no evidence that Mother has allowed the negativity exhibited in these text messages to enter into her relationship with E.J. As such, while

---

[16] Mother testified that she is now pregnant and the unborn child will be E.J.'s sibling. At the initial hearing, counsel attempted to enter into evidence a home pregnancy testing stick to prove the existence of the pregnancy. The Court refused to take this evidence. At a subsequent hearing, Mother contended that she was 16 or 20 weeks pregnant yet had no medical documentation to submit to confirm the existence of her pregnancy. Mother was unclear as to whether she had even seen a physician and then suggested that she had insurance issues that prevented it, which later changed to not having any issues and that she had been to a "clinic" on a couple of occasions. Father has not contested Mother's assertion that she was pregnant, but the testimony presented was certainly muddled and problematic as it related to the pregnancy claim. If Mother's is pregnant and delivers her child, this factor would then weigh in favor of Mother.

[17] Mother's fiancé also testified that he did not believe that Father was capable of supporting E.J. and suggested that Father was not providing for E.J. As noted, Father has demonstrated that he spends a substantial amount of time with E.J. and that he provides for E.J. during those periods. Tolar's accusations regarding Father's inability to support E.J. were unwarranted and further suggest that since the proposed relocation was raised, there is certainly an increased hostility between Father and Mother as a result of Father's opposition to the relocation.

25

the Court has strong concerns about the nature of Mother's text messages, this factor was not considered any further.

      (9)     § 5328(a)(9): Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

Both parents have shared in the parental duties related to E.J., and both parents are capable of providing a loving, stable, consistent and nurturing relationship with E.J. Mother admitted that E.J. and Father have a very close relationship. As such, this factor does not weigh in favor of either party as it relates to E.J.'s emotional needs.

      (10)    § 5328(a)(10): Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

The evidence demonstrated that both parties attend to the daily physical, emotional, developmental and education needs of E.J. Mother plainly trusted Father's abilities as she would allow Father to come to her residence to bath E.J. and get him ready for bed when Mother was otherwise not available. As to educational needs, Mother testified that she was the parent who enrolled E.J. into preschool and that she was also the party that primarily paid for it. In this regard, Mother has shown more initiative than Father, and for this reason, this factor likewise weighs slightly in favor of Mother.

      (11)    § 5328(a)(11): The proximity of the residence of the parties.

Prior to Mother's relocation this past summer, the parties live in close proximity to each other that permitted them to exchange E.J. on a very consistent basis. Father was able to see E.J. based upon his work schedule which translated into approximately 50% (or more) of the time. (Resp. Ex. 2.) As noted previously, Mother's proposed

26

relocation would have eliminated the ability of Father to have that meaningful contact with E.J. and Mother's proposed partial custody schedule would not have even approximated the same amount of contact between E.J. and Father.

When Mother resides in Susquehanna County, the parties have residences that allow for frequent custody exchanges that promote the continued development of a strong and close relationship with both parents. Mother has made clear in her relocation notice that she would only relocate if she obtained court approval. If Mother does not relocate, the parties can continue to share custody in a way that allows for the continued close relationship between E.J. and his parents. As such, this factor was not considered any further except to the extent that it plainly weighed against relocation.

> (12) § 5328(a)(12): Each party's availability to care for the child or ability to make appropriate child-care arrangements.

The current custody arrangement has not required either party to be concerned with daycare coverage. When Father is not working, he had custody of E.J.[18] Mother has not worked for several years so daycare coverage was never an issue. Both Mother and Father have extended family available to provide daycare coverage if necessary. There is nothing on this record to suggest that daycare coverage has ever been an issue for either party. For this reason, this factor does not weigh in favor of either party.

---

[18]     Mother complained that Father would not take E.J. if he was working. It is unclear why Mother would try to make Father take E.J. during a period of time that he was unavailable to have partial custody of E.J. as a result of his work schedule. This especially true where Mother has not been employed since 2012 (aside from her 2015 business connected with the removal of erosions control devices related to natural gas activities).

27

(13)   § 5328(a)(13): The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.

The parties both testified that they have been able to work with each other and cooperate for the sake of E.J. Aside from opposing Mother's relocation, there is nothing on this record to suggest that Father does not communicate well with Mother.

Prior to the proposed relocation, Mother and Father have worked very well together and have not even needed a court ordered custody arrangement. The only thing that has created conflict between the parties is Mother's proposed relocation and Father's opposition to it. As noted earlier, Mother sent two text messages that were wholly inappropriate and demonstrated a strong animosity toward Father. To his credit, Father did not respond to Mother's attacks in a derogatory or otherwise inappropriate way. Mother's testimony made clear that she resents Father's opposition to her proposed relocation and that Mother feels entitled to relocate with E.J. It is too early to tell how Father's opposition to the relocation will impact the long term relationship between the parties.

The Court cannot ignore Mother's text messages and attitude toward Father as exhibited during her testimony. The resentment that Mother is harboring toward Father will only poison the prior good relationship between the parties if Mother allows it to continue unchecked. For this reason, this factor weighs in favor of Father.

(14)   § 5328(a)(14): The history of drug and alcohol abuse of a party of member of a party's household.

There was no evidence that either of the parties had any kind of drug or alcohol abuse history. There was evidence that Mother voluntarily began attending Alcoholics

28

Anonymous and had approximately a year of sobriety before she decided that she did not have a drinking problem. Mother does not believe that she is an alcoholic and indicated that she was only concerned that her pattern of drinking behavior had the potential to blossom into alcoholism. Mother should be commended for taking proactive steps to address any potential drinking problem before it became a problem. This evidence speaks only to Mother's maturity not to any alcohol abuse issue.

For this reason, this factor was not considered.

> (15) § 5328(a)(15): The mental and physical condition of a party or member of a party's household.

There is no evidence of any mental health or physical condition or either party – of any member of their household – that would negatively impact upon E.J. For this reason, this factor was not considered.

> (16) § 5328(a)(16): Any other relevant factor.

The court did not consider any other factors aside from those set forth in this opinion.

### III. Conclusion

Upon considering the general custody award factors, it is clear that Mother has failed to demonstrate that relocation to Mississippi would be in the best interests of E.J. For the reasons set forth herein, Mother's request for relocation is denied. Given that Mother has represented that she will not relocate if the Court denied her relocation request, the Court will not consider a custody award based upon Mother's representation that she will continue to live in Susquehanna County.

The record plainly demonstrates that the parties have work well together, co-parented and accommodated their respective schedules and obligations so that E.J.

29

has spent substantial periods of time with both parents. This practice must continue for the sake of E.J.

The parties will be awarded joint legal custody of E.J. Mother will be awarded primary physical custody. Father will have substantial periods of partial custody based upon his work schedule. On the days of Father's swing shift where he is not working, Father shall have partial custody of E.J. commencing on the evening prior to his first day off and ending upon the evening of the day prior to returning to work. In the event Father's work schedule does not allow for custody exchange to occur during the morning hours, then the parties will exchange custody of E.J. the following morning.

30