J-A17026-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| RACHEL TALLEY | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DANIEL TALLEY | : | |
| | : | |
| Appellant | : | No. 267 EDA 2023 |

Appeal from the Order Entered December 20, 2022
In the Court of Common Pleas of Montgomery County
Civil Division at No(s): 2008-29319

BEFORE: KING, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY SULLIVAN, J.:  **FILED SEPTEMBER 19, 2023**

Daniel Talley ("Father") appeals from the court's order denying his petitions to: (1) modify custody of the daughter ("Child"), born in 2007 to him and Rachel Talley ("Mother");[1] (2) find Mother in contempt of the existing custody order; and (3) order a custody evaluation. The court also denied Mother's petition for fees, costs, and expenses. We affirm.

This appeal is the latest event in a fifteen-year-long custody dispute between Father and Mother. The trial court presided over a previous custody trial in 2020 and conducted an evidentiary hearing in 2022 on Father's subsequent petitions to modify the existing custody agreement to allow him shared legal custody and more visitation; for contempt against Mother; and

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Mother has remarried and uses her married name, "Welch."

for a custody evaluation, and on Mother's petition for fees, costs, and expenses.

At the December 2022 hearing, Mother gave the following testimony: Child is fifteen years old and very involved with her half-sister. Child is very involved in cheer squad and tumbling. She also has a close relationship with Mother's family. *See* N.T., 12/19/22, at 18-31. Mother works from home and is better able to take Child to extracurricular activities than Father, who, after a move, lives between twenty-seven and thirty miles away. *See id*. at 32-40. Child does not always do her homework when at Father's house. *See id*. at 44.[2] Mother keeps Father fully informed of Child's medical appointments[3] and academic needs and progress through the "Our Family Wizard" app. *See id*. at 49-51. Father refused to take Child for a COVID test in advance of an ear surgery, which required Mother to get the test earlier and obtain a waiver of the rule that a patient must be COVID-tested within forty-eight hours of surgery. *See id*. at 58-63.[4]

---

[2] On multiple occasions during Mother's testimony, Father blurted out, "That's a lie." *See* N.T., 12/19/22, at 44 (twice), 85-86.

[3] Child has epilepsy and has had multiple ear surgeries. *See* N.T., 12/19/22, at 55-58, 63-65.

[4] On cross-examination, Mother testified that Father's uncooperativeness before she obtained sole legal custody of Child prevented her from taking Child to an ENT, which complicated the Child's treatment for her ear problem. *See id*. at 103-04.

Mother also testified: she and Father had a dispute about custody when she was on vacation with Child in Maryland ("the Maryland vacation"); Father insisted on picking up Child from Mother's home rather than Maryland and refused to give Mother less than one-day's extra custodial hours in exchange for extra time later that week. Father threatened to call the police while Mother was driving Child home from Maryland, causing Child anxiety. In reprisal for the Maryland vacation, Father took Child on a weekend when he did not have custody. *See id*. at 70-79. Mother pays for all of Child's activities and spends considerable money on legal fees to respond to Father's various legal filings. *See id*. at 85-86. Mother does not criticize Father to Child. *See id*. at 88-91. At a school event, Child chose to use a hyphenated last name incorporating her stepfather's name. *See id*. at 113-15.

Father's friend, Michelle Houser testified that Father and Child have a good and loving relationship. *See id*. at 126-30. Father testified to the following: he moved to a new house to be closer to Child and is making an extra big bedroom for her. *See id*. at 133-41. He was not allowed to talk to Child when he was in jail and did not have contact with her for one year. *See id*. at 142-43. His relationship with Child improved since the 2020 custody trial,[5] and with him, she is able to do things she cannot do with Mother like horseback riding, flying in a plane, going to an amusement park, and attending

---

[5] The court stated it was aware of the history of Father's relationship with Child from the 2020 trial. *See* N.T., 12/19/22, at 155.

- 3 -

professional sporting events. Father produced photographs of Child smiling when with him to show that she was happy being with him. *See id*. at 145-49. Father characterized Mother's criticism of his being late for events as "the same kind of made-up nonsense I've been hearing ever since [Child] was a little kid." *See id*. at 150-51. Father claimed he helped Child by phone with her homework and Mother and stepfather frequently yelled at her for being on the phone with him. *See id*. at 151. Father testified there were times when Child was at his house, forgot to do her homework and got a phone call from Mother, which required Child to stop everything to finish the homework. *See id*. at 154.

Father testified he worked with Child on things that gave her trouble, like grocery shopping and budgeting. *See id*. at 157-61. He asserted Mother left Child's ear problem unaddressed for six years and deafness would have resulted had he not intervened. He also expressed his concern about Mother's alleged lack of attention to Child's epilepsy and seizure disorder. *See id*. at 164-71. He complained Mother frequently tracks Child on her phone when Child is with him. *See id*. at 171-72. He asserted that he is "an absolutely wonderful and amazing parent," and Mother is manipulative and makes things up. *See id*. at 192, 195, 207.

Concerning his contempt petition, Father testified: he and Mother disagreed about where he would pick Child up from the Maryland vacation. He refused to pick Child up in Maryland and insisted on an equidistant meeting

point. Mother refused to compromise and extended the vacation and her custodial time by four or five hours. *See id*. at 174. When Mother brought Child to him, he told her he would call the police and report an alleged kidnapping, because Mother had accused him of kidnapping years before. *See id*. at 172-77. Father also testified he and Mother disagreed about Child's medical care. He became angry upon learning Child used a hyphenated last name that included her Mother's new last name at a school concert. *See id*. at 179-180, 182. He also testified Mother failed to communicate effectively concerning the COVID test Child was required to take prior to ear surgery. *See id*. at 186. He asserted Mother scheduled "hundreds of events" during his custodial time. *Id*. at 186-90.

The trial court spoke *in camera* to Child in the presence of the guardian *ad litem* ("GAL"). Child stated things were "going great" with Mother, and Father "got a dog, so that's a plus." *See* N.T. 12/19/22 at 4 (separate transcript). Child stated that Father forced her to go on an eight-hour road trip to three states and stay overnight in a hotel room with him to get "this freaking dog." *See id*. at 4-5. She added:

> I know that he's trying to puppy guilt trip me into wanting to stay with him more, but . . . whenever we talk, there's also that sense of, I don't want to slip up on saying something, because I know that if I do, there's nobody there to . . . back me up. Because . . . I know what I want to say to him. It's just my anxiety gets the better of me. . ..

*See id*. at 5. Child explained that Father reacts badly and "verbally attack[s] her by saying, 'I'm the only person that's ever done this kind of stuff for you.'"

*See id*. at 9. She compared Mother's offers to allow Child to decide if she wanted to stay extra time with Father's approach of "you're staying with me, end of discussion. You don't get to see your Mom, you don't get to drop your stuff off at the house. You're staying." *See id*.

Child also stated that Father has been disciplining her for not picking up the phone or texting him back when she is with Mother: "He has made it very clear that if I do not answer, and it's more than one day in a row, there will be consequences." *See id*. at 7. Those consequences include limiting her phone time. About Father, Child said, "He wants what he wants when he wants it." *See id*. Child explained she likes to have her phone at Father's house in case he gets in her face and threatens her about "anything[,] pretty much." *See id*. at 8. She said that in 2022, Father was ".5 percent better, which is sort of an improvement," but at the same time, "[I] would much prefer, if I have to endure it [visits with Father], [that] I endure a very low level of it." *See id*. Child feels a little bit of pressure from Father when he says, "Name somebody else that's done as much for you as I have." *See id*. at 8-9. Child said that Mother is "very kind and understanding of the situation, and never tries to say anything against [Father], because she wants me to have my own opinion." *See id*. at 9-10.

Child stated in the photographs Father showed the court she put on a happy face because, "[I]f I look the least bit anxious or uncomfortable, he'll try to pull all of this brain manipulation psychology stuff. . . ." *See id*. at 10.

At the GAL's suggestion, the court asked Child about abuse. Child denied any abuse by Mother but as to Father stated, "by definition, no emotional abuse, although it does feel like it sometimes. . . ." *See id*. at 11. Child added that Father does not live thirty minutes from Mother as he claimed and "the fact that he's keeping up that lie to me as well is just absolutely – like, he's lying. I think he's trying to sway my opinion into his favor by saying he only lives 30 minutes away, where, in reality, it's an hour, give or take a couple of minutes." *See id*. at 12.

During argument at the conclusion of testimony, Father's counsel did not cite the sixteen custody factors ("factors") under 23 Pa.C.S.A. § 5328(a), *see* N.T., 12/19/22, at 227-28; Mother's counsel did. *See id*. at 234-39. The court reviewed all sixteen custody factors. The court found although there was hostility on both sides, Mother was more conciliatory than Father (factors one and two), Child had mentioned Father in the context of abuse (factor two),[6] and the record did not support Father's allegations that Mother intentionally hid anything from Father or was slow to respond to Child's ear problem as he claimed, and Mother does "the lion's share of the work" (factor three). *See id*. at 241-47. The court found Child knows how to put a happy face on for the camera (factor four), is very close with Mother's other child

---

[6] Father immediately stated, "She's lying," prompting the court to continue that Child was "worried about the ramifications, as am I, about Dad's reaction to this Court sharing that information." *See* N.T., 12/19/22, at 246.

(factor six), and Father took Child's phone and was emotionally abusive (factor seven). The court found Mother is more likely to maintain a loving, stable, consistent, and nurturing relationship for Child although she is a bit of a helicopter parent (factor nine), and is more likely to attend to Child's daily physical, emotional, developmental, and educational needs (factor ten).[7] The court noted that Child did mention that the distance between the house was not thirty minutes (factor eleven), Mother is more available to care for Child (factor twelve), and the remaining factors weighed evenly. *See id*. at 249-58. The court separately emphasized the importance of factor seven, Child's well-reasoned preference, and stated that it did not believe Mother manipulated Child. *See id*. at 258-59.

The court denied Father's petitions to modify the custodial arrangement, for contempt, and for a new custody evaluation. It denied Mother's petition for fees, costs, and expenses. It issued an order stating that neither party shall engage in frivolous and/or repetitive and/or baseless filings which would be subject to dismissal and possible sanctions and attorneys' fees. *See* Order 12/19/22, at 2 (unnumbered). Father timely appealed, and he and the trial court complied with the timeliness requirements of Pa.R.A.P. 1925.

_____

[7] The court **credited** Mother's testimony about her scheduling of appointments, her follow-through, and her sharing information with Father, and rejected Father's contrary claim. *See* N.T., 12/19/22, at 255.

On appeal, Father presents seven issues for our review:

A. Whether the trial court erred as a matter of law denying [Father's] Motion to Modify Custody Order?

B. Whether the trial court abused its discretion in denying [Father's] Motion to Modify Custody Order?

C. Whether the trial court erred as a matter of law in denying [Father's] Motion for Contempt of Custody Order?

D. Whether the trial court erred as a matter of law in denying [Father's] Petition for Custody Evaluation?

E. Whether the trial court abused its discretion in denying [Father's] Petition for Custody Evaluation?

F. Whether the trial court erred as a matter of law in ordering that "[a]ny frivolous and/or repetitive or baseless filings shall be dismissed?"

G. Whether the trial court abused its discretion in ordering that "[a]ny frivolous and/or repetitive or baseless filings shall be dismissed?"

Father's Brief at 7-8 (punctuation added).

Father's first two issues assert error regarding the denial of his petition

to modify custody. As this Court has stated:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*See S.S. v. T.J.*, 212 A.3d 1026, 1034 (Pa. Super. 2019) (citation omitted). Additionally, the trial court's discretion should be accorded "the utmost respect," because of the lasting effect of the proceeding and "the knowledge gained by a trial court in observing witnesses" which "cannot adequately be imparted to an appellate court by a printed record." *Id.* at 1034-35 (quoting *Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006)).

In any custody case, a child's best interests are the court's paramount concern. *See* 23 Pa.C.S.A. § 5328(a). In deciding on a petition to modify custody, the court considers all relevant factors, giving weight to the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

*Id*. *See E.D. v. M.P.*, 33 A.3d 73, 79-80 (Pa. Super. 2011).

Father's first two issues assert a trial court may not merely advert to prior, manifestly outdated findings of fact to support a custody ruling, and that he testified to various changes in circumstances about his relationship with Child, which he lists. *See* Father's Brief at 13-14. Regarding these issues, Father's Rule 1925(b) statement asserts: "1. Whether the trial court erred as a matter of law in denying [Father's] Motion to Modify Custody Order," and

"2. Whether the trial court abused its discretion in denying [Father's] Motion to Modify Custody Order." *See* Father's 1925(b) Statement, 1/13/23.

Pennsylvania Rule of Appellate Procedure 1925(b) states that a statement of errors complained of on appeal "shall concisely identify each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge." *See* Pa.R.A.P. 1925(b)(4)(ii). This Court may find waiver where a concise statement is too vague. *See In re A.B.*, 63 A.3d 345, 350 (Pa. Super. 2013); *see also* Pa.R.A.P. 1925(b)(4)(vii).

The trial court asserts that Father's Rule 1925(b) statement failed to describe the alleged error with sufficient detail for the court to respond to the claim. *See* Trial Court Opinion, 2/14/23, at 2. We agree.

Father's boilerplate 1925(b) statement warrants the trial court's finding of waiver. *See* Pa.R.A.P. 1925(b)(4)(ii), (vii); *A.B.*, 63 A.3d at 350. Even if reviewable, however, his claims would fail. Father claims he has concerns about Child's well-being and Mother cancelled necessary medical appointments for Child. *See id*. at 14-15. This Court must defer to the trial court's credibility determinations and its factual findings that are supported by the record. *See M.G. v. L.D.*, 155 A.3d 1083, 1100 (Pa. Super. 2017). As this Court stated recently in response to a claim, similar to Father's, that essentially asked this Court to reweigh the factors the litigant considered relevant:

> [W]hether [parent's] reasons are persuasive is not our call to make. [Parent's] appellate argument fails because it does not

appreciate our role, nor the deferential standard of review that we must employ. . . . The crux of [parent's] argument is that the trial court should have found [parent's] testimony more persuasive than [opponent's]. This is not cause for us to find error or an abuse of discretion.

*White v. Malecki*, 296 A.3d 1210, 1215 (Pa. Super. 2023). Notably, Father failed to articulate how the court committed error in its meticulous weighing of the sixteen custody factors. Moreover, the record shows the court did not rely on outdated factors but on the evidence adduced at the hearing. He cannot prevail on his claim.

Father's third issue alleges the trial court abused its discretion by declining to find Mother in contempt of court. This Court's standard of review concerning a trial court's contempt findings is "very narrow." The Court is limited to determining whether the trial court committed a clear abuse of discretion, and places great reliance on the sound discretion of the trial judge. *See G.A. v. D.L.*, 72 A.3d 264, 269 (Pa. Super. 2013). An abuse of discretion occurs where a trial court "overrides or misapplies the law or exercises judgment which is manifestly unreasonable, or reaches a conclusion that is the result of partiality, prejudice, bias or ill will as shown by the evidence of record." *Gross v. Mintz*, 284 A.3d 479, 489 (Pa. Super. 2022) (citation omitted). To sustain a finding of civil contempt, a complaint must prove three elements by a preponderance of the evidence: (1) that the contemnor had notice of the specific order or decree which he is alleged to have disobeyed; (2) that the act constituting the contemnor's violation was volitional; and (3)

- 13 -

that the contemnor acted with wrongful intent. *See **P.H.D. v. R.R.D.***, 56 A.3d 702, 706 n. 7 (Pa. Super. 2012) (citation omitted).

Father's 1925(b) statement asserted that "the trial court erred as a matter of law in denying [Father's] Motion for a Contempt of Custody Order." *See* Father's 1925(b) Statement, 1/13/23.

The trial court found that Father's Rule 1925(b) statement failed to describe the error with sufficient detail for the court to respond to the claim and the claim was unreviewable. *See* Trial Court Opinion, 2/14/23, at 2. The law supports the trial court's conclusion. *See* Pa.R.A.P. 1925(b)(4)(ii), (vii); ***A.B.***, 63 A.3d at 350.

Even if Father's issue not waived, no relief would be warranted. Father asserts he presented ample evidence Mother failed to comply with her court-ordered obligation to keep him apprised of medical and educational issues and Mother failed to comply with the custody order concerning her Maryland vacation. *See* Father's Brief at 17-20. The credited evidence shows Mother did keep Father apprised of all medical and health issues and, further, drove Child back to Pennsylvania from the Maryland vacation as he demanded. Concerning Father's assertions that Mother failed to keep him informed of Child's activities, the court stated Mother had been "masterful" in her scheduling of appointments, follow-up, follow-through, and sharing information, and "notwithstanding [t]hat [F]ather says . . . he's in the proverbial dark. . . . [the record] completely belies that." *See* N.T., 12/19/22,

at 255. Father's contrary claim has no merit. *See M.G. v. L.D.*, 155 A.3d at 1100.

Father's fourth and fifth issues allege that the court abused its discretion or erred as a matter of law by denying a custody evaluation. A court is not mandated to order a full custody evaluation but may do so at its discretion. *See T.M. v. H.M.*, 210 A.3d 283, 289 (Pa. Super. 2019) (citing Pa.R.Civ.P. 1915.8(a)).

The trial court found that Father's Rule 1925(b) statement failed to describe the error with sufficient detail for the court to respond to the claim. *See* Trial Court Opinion, 2/14/23, at 2. We agree Father's claim is waived for lacking sufficient detail. *See* Pa.R.A.P. 1925(b)(4)(ii), (vii); *A.B.*, 63 A.3d at 350. The claim is also waived because Father fails to cite relevant case law in his brief. *See In re Estate of Whitley*, 50 A.3d 203, 209-10 (Pa. Super. 2012). The only case Father cites is one stating that a court may order a custody evaluation. *See* Father's Brief at 20.

Even if reviewable, Father's claim merits no relief. A court *may* order a custody evaluation but is not compelled to do so. *See T.M.*, 210 A.3d at 289. The trial court had familiarity with Child having conducted a two-day custody trial within the past two years. The court also interviewed Child *in camera* at the 2022 hearing and assessed the changes in Child's life. In essence, Father argues the court did not give sufficient weight to his assertion that his relationship with Child had improved. *See* Father's Brief at 21-22 (stating

that "Father and [Child] had more opportunities to strengthen their relationship. . . . Under these changed circumstances, a second evaluation would have been beneficial to assist in determining [Child's] best interests. . . ."). Additionally, the GAL told the court that another evaluation would "just cause more delay and more stress for [Child]. . . . [Child] has requested to be interviewed by the court. . . . I don't think anything new has arisen." **See** N.T., 12/19/22, at 10-11. The trial court did not abuse its discretion or err as a matter of law under those circumstances. **See White v. Malecki**, 296 A.3d at 1215; **See M.G. v. L.D.**, 155 A.3d at 1100.

Father's sixth and seventh issues assert the trial court erred as a matter of law and abused its discretion by ordering that the parties "refrain from future filings." Father asserts that he "testified candidly" that "he had and has no choice but to seek court intervention when he believes that [Child's] particular medical needs are not being met." **See** Father's Brief at 22.

Pennsylvania Rule of Professional Conduct 3.1 provides that "[a] lawyer shall not bring . . . a proceeding, or assert . . . an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law."

The trial court stated that Father "lacks a legally enforceable interest in filing frivolous, baseless or repetitive applications . . . hence he cannot be aggrieved by an order that merely states an intention to dismiss a future

application that is frivolous, baseless or repetitive." **See** Trial Court's Opinion, 2/14/23, at 2. The trial court is correct.

Father's claim includes no relevant case law. Additionally, he asserts only his own testimony to support his claim that Mother did not provide him relevant medical information, an assertion the court rejected, as previously discussed. Finally, the order is not directed to Father specifically. It requires that both counsel and parties abide by the Rules of Professional Conduct. Father has no enforceable right to fail to abide by those rules.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/19/2023

- 17 -